## CALIFORNIA & OREGON LAND CO. v. WORDEN.

(Circuit Court, D. Oregon. February 11, 1898.)

### No. 2,415.

1. PUBLIC LANDS—MILITARY ROAD GRANT—INDIAN RESERVATION.

Alternate sections were granted by the United States to aid in the construction of a military road, the route of which lay through Indian country. Afterwards, by treaty, the Indians ceded to the government a large region described by metes and bounds. Following the words of cession was a proviso that "the following described tract, within the country ceded by this treaty," should be "set apart as a residence for said Indians, and held and regarded as an Indian reservation." *Held*, that this was not a cession and recession of the reserved lands, but a mere reservation to the Indians of the same title and right that they originally had, and hence that the military road grantees acquired no better right in sections falling within the reservation than they had before; so that a subsequent allotment of lands in severalty to certain of the Indians, pursuant to the treaty, was no infringement of its rights.

2. SAME—RES JUDICATA.

In a suit by the government to cancel the title to lands granted to aid the construction of a military road on the ground that the lands were never earned, and that the government had been imposed upon by false certificates of completion, a decree against the government on the ground that defendant was an innocent purchaser for value from the grantees is not an adjudication that defendant has the absolute beneficial ownership of all the lands, including some sections lying within an Indian reservation, to which the Indian title has never been extinguished.

This was a suit in equity by the California & Oregon Land Company against Charles E. Worden, an agent of the United States, to enjoin him from making allotments in severalty of certain lands to members of an Indian tribe. The cause was heard upon a motion for preliminary injunction.

Dolph, Mallory & Simon, for complainant.
The United States Attorney, for defendant.

BELLINGER, District Judge. On the 2d day of July, 1864, congress granted to the state of Oregon, to aid in the construction of a

military road from Eugene City to the eastern portion of the state, alternate sections of public lands, designated by odd numbers, for three sections in width on each side of said road.    The road was required to be completed within five years, but this time was, by a subsequent act, extended to July 2, 1872.    The act provided that the certificate of the governor of Oregon, filed with the secretary of the interior, certifying that the road had been completed, should be evidence of such completion.    On October 26, 1864, the legislature of Oregon transferred the grant to the Oregon Central Military Road Company, which company completed the road in compliance with the grant of congress, and such completion was certified to the secretary of the interior by the governor of Oregon on January 12, 1870.    The complainant has succeeded to the interests of the military road company under the grant.    Thereafter the proper officers of the government selected the lands earned under the grant, and made lists thereof, which were certified by the commissioner of the general land office, as required by law. About 130,000 acres of the land so selected and certified lie within the limits of the Klamath Indian reservation, and the controversy arising in this case is with reference to these lands.

At the time of the grant by congress, the lands east of the Cascade Mountains, through which the military road was located, were occupied by Indian tribes, whose title thereto had not been extinguished, and were "Indian country."    Prior to the road grant by congress, and on March 25, 1864, congress passed an act authorizing the president to conclude a treaty with the Klamath, Modoc, and Snake Indians, for the purchase of the country occupied by them (13 Stat. 37), and appropriating $20,000 for such purchase.    The lands in controversy were included within the proposed purchase.    In pursuance of this act, a treaty was concluded on October 14, 1864, which was subsequently, and on July 2, 1866, ratified by the senate.    16 Stat. 707. The treaty, as ratified by the senate, contained two amendments, consisting of mere verbal corrections in no wise affecting its sense, with the result that a second convention was had on December 10, 1869, at which the so-called amendments were assented to by the contracting tribes, and thereafter, on February 17, 1870, the president's proclamation of ratification was published.    The treaty provides that:

"The tribes of Indians aforesaid cede to the United States all their right, title, and claim to all the country claimed by them, the same being determined by the following boundaries, to wit: Beginning at the point where the forty-fourth parallel of north latitude crosses the summit of the Cascade Mountains; thence following the main dividing ridge of said mountains in a southerly direction to the ridge which separates the waters of Pitt and McCloud rivers from the waters on the north; thence along said dividing ridge in an easterly direction to the southern end of Goose Lake; thence northeasterly to the northern end of Harney Lake; thence due north to the forty-fourth parallel of north latitude; thence west to the place of beginning: provided, that the following described tract, within the country ceded by this treaty, shall, until otherwise directed by the president of the United States, be set apart as a residence for said Indians, and held and regarded as an Indian reservation."

The lands in controversy are comprised within this reservation.    By this treaty the tribes contracting agreed and bound themselves that immediately after the ratification of the treaty they would remove to said reservation, and remain there, unless temporary leave of absence

was granted them by the superintendent or agent having them in charge. It was stipulated on the part of the United States that there should be erected on this reservation, at suitable points, and kept in repair for 20 years, a saw mill and a flouring mill, and suitable buildings for the use of a blacksmith, carpenter, and wagon and plow maker, and for a manual labor school, and such hospital buildings as should be necessary, and that the necessary tools and materials for these mills and shops, and books and stationery for the manual labor schools, should be furnished during such period of 20 years. The United States is proceeding by its agent, the defendant herein, to make allotments of the lands reserved among the Indians, in pursuance of article 6 of the treaty, which makes provision therefor; whereupon this suit is brought to enjoin such allotments, upon the ground that these lands belong to the complainant company under the road grant of July 2, 1864. The hearing which has been had is upon an order to show cause why a preliminary injunction should not issue.

When this grant was made, the right of occupancy of the Indian tribes in the territory including the reservation had not been extinguished. The fee was in the United States, subject to this right. This right is referred to by the supreme court of the United States as a "title," as a right "as sacred as that of the United States to the fee. * * * This right of use and occupancy by the Indians is unlimited. They may exercise it at their discretion. If the lands in a state of nature are not in a condition for profitable use, they may be made so. If desired for the purpose of agriculture, they may be cleared of their timber to such an extent as may be reasonable under the circumstances. The timber taken off by the Indians in such clearing may be sold by them." U. S. v. Cook, 19 Wall. 593. For all purposes, therefore, save only that of private sale, the Indians were in fact the owners of these lands. And this right, title, or interest has never been surrendered by them. The treaty cedes to the United States all the right, title, and claim of the Indian tribes to all the country claimed by them, the same being described by boundaries which include the reservation. This section is followed by a proviso as follows: "Provided, that the following described tract within the territory ceded by this treaty, shall, until otherwise directed by the president of the United States, be set apart as a residence for said Indians, and held and regarded as an Indian reservation." Then follows a description of the reservation. It is argued that this cession extinguishes the Indian right to the entire Indian country, and the proviso establishes a new right, which, being new, is subordinate to the prior road grant. The Indian right under the treaty, as to the particular lands, is precisely what it was before the treaty. By the terms of the treaty, the fee remains in the government, and the right of occupancy in the Indians, as before. If the Indians' present right is a new one, it must have been preceded by a surrender of the right of occupancy originally held by them. But how can the cession of the treaty precede the reservation, when both depend upon the same treaty stipulation? In this case the right of the Indians to the lands in dispute is reserved in a proviso contained in the article of cession by them, and is a condition of the cession of the domain within which such lands are included. The cession in

its terms is of all the Indian country, and the residence set apart for the Indians is described as being within the tract ceded. The language employed in the article of cession cannot alter the fact that there has been no instant of time when the Indians did not have this right of occupancy. Upon the theory of complainant, it was vested as soon as divested, and by the same stipulation; it was surrendered and reacquired by the same act; and, overlooking the incongruity of such a statement, it results that the right has been without interruption, and continuous. It is impossible that a party can be both the grantor and grantee of the same premises, in the same right, in the same stipulation. The proviso in the article of cession in the treaty in question operates as a reservation of the rights held by the Indians at the time the treaty was entered into in the tract described, and, if the fee of the lands in controversy is vested in the road company, yet the proposed allotment in severalty and use is within the right or title possessed by the Indian tribes, with which the fee is burdened.

It is also contended that the issues involved in this suit were involved in the suit of the United States against the complainant company, and that the matters in dispute are therefore res adjudicata between the parties. That suit was an attempt to cancel the title held under the road grant upon the ground that the lands taken thereunder were never earned, and that the government had been imposed upon by a false certificate of completion, procured through the fraudulent contrivance of interested parties. To that complaint the defense of bona fide purchase for value and without notice was made and sustained. The questions involved in that case are not involved in this. That case did not admit of an adjudication of the question at issue here, which is one of title to particular lands under the grant. The doctrine of bona fide purchase is not a rule of property or of title. "Whenever the relations between the litigants are of such a nature, and the suit is of such a kind, that a court of equity is called upon to decide, and must decide, the merits of the controversy, and determine the validity and sufficiency of the opposing titles or claims, then it does not admit the defense of bona fide purchase as effectual and conclusive." 2 Pom. Eq. Jur. § 739. In the case referred to, the government, having an equity growing out of the fraud alleged, sought to enforce it against those who held the title to the lands acquired under the grant. This equity the defendant company avoided by invoking in aid of its legal title an equity of its own arising from the payment of money, and the taking of title without notice. The court, in such case, does not adjudicate the title. It merely refuses to grant relief against the purchaser having the title because of the bona fides of his purchase. In that case the only question was one of good faith on the part of the road company and the payment of money. In this case the right of the company to the lands granted is conceded, and the only question is whether the grant attached to the particular lands in dispute. The paramount Indian right of occupancy was not, and could not be, affected by the bona fide purchase of the road company. The doctrine of bona fide purchase cannot be invoked against a paramount outstanding title or right, and it has not been attempted in the case relied on. In that case the government admitted that the road com-

pany had title to the lands described, and it sought to impeach that title for fraud. And for the purposes of this case it may be conceded that the legal title to the particular lands is in the road company. If so, as already stated, it has such title with the burden of the right of occupancy in the Indian tribes. That right was not involved in the case referred to. The application for a preliminary injunction is denied.