## UNITED STATES v. OREGON CENTRAL MILITARY ROAD CO. et al.

(Circuit Court, D. Oregon.  June 30, 1900.)

1. PUBLIC LANDS—GRANT FOR WAGON ROAD—LOCATION THROUGH INDIAN RESERVATION.

Act July 2, 1864 (13 Stat. 335), made a grant of lands to aid in the construction of a wagon road from Eugene City, Or., to the eastern boundary of the state, to be selected within three miles of such road, the route for which was not prescribed, beyond requiring it to cross the Cascade Mountains through the most feasible pass near Diamond Peak. Prior to this act, congress had authorized the president to conclude a treaty with the Klamath, Modoc, and Snake Indians for the purchase of the country occupied by them in Southeastern Oregon (13 Stat. 37), and in pursuance of such authority a treaty was made with the Indians October 14, 1864, by which a tract within such country was reserved for the perpetual occupancy of the Indians, and the remainder was ceded to the United States. This treaty was ratified by the senate in 1866, with certain unimportant verbal corrections, which were ratified by a convention with the Indians December 10, 1869, and the treaty was formally proclaimed by the president February 17, 1870. It went into effect, however, for all practical purposes, in 1866, from which time appropriations were made by congress, and buildings and improvements erected on the reservation as therein provided. In 1869 the road company completed its road to a point 30 miles north of the reservation, and during that year filed a general map of its further location, extending southward through the reservation so as to include within the land-grant limits the most of the arable land therein, which the company claimed under its grant, and for a portion of which it received patents from the land department on completion of its road. *Held*, that the grant did not operate to at once deprive congress of the power to dispose of any of the public lands in Eastern Oregon awaiting the pleasure of the grantee in locating its road, and that the grantee acquired no title thereunder to any of the lands within the reservation as against the Indians who were in occupancy, and whose rights were reserved in the same treaty by which they ceded the remainder of their lands, and as a part of the consideration for such cession; nor did it acquire the title subject to the right of occupancy by the Indians, who were given by the treaty the right to obtain allotments of lands within the reservation in severalty, and to hold the same in perpetuity unless thereafter sold by the United States for their benefit.

2. SAME—PURCHASER FROM GRANTEE—NOTICE OF DEFECTS IN TITLE.

A purchaser from the road company of the lands which had been certified to it under its grant, including those within the Indian reservation, which were at the time of the purchase occupied by the Indians, and on which buildings and improvements had been placed by the government, was chargeable with notice of the Indians' rights therein under the treaty, and cannot claim, as a bona fide purchaser, to stand on any better ground as against such rights than the original grantee.

3. SAME—CANCELLATION OF PATENTS—BONA FIDE PURCHASERS.

A purchaser from the grantee of lands which have been patented or certified under a grant for a public improvement is not chargeable with notice of matters of fact which may affect the grantee's title, such as the location of the limits of the grant, but is entitled to rely on the presumption that such facts were correctly ascertained by the land department; and as against such a purchaser the United States is not entitled to a cancellation of a patent on the ground that it was erroneously issued for lands which were not in fact within the limits of the grant.

4. JUDGMENTS—RES JUDICATA—MATTERS CONCLUDED.

The judgment in an action brought, pursuant to an act of congress, to determine whether a road company had complied with the terms of a land

grant, and, if not, to recover the lands certified or patented thereunder, does not constitute an adjudication which will bar a second suit by the United States to cancel patents issued under the same grant, on the ground that the lands thereby conveyed were not within the grant, where there is no issue in the second suit which was litigated in the first.

In Equity. Suit by the United States to cancel certain certificates and patents to lands issued under a grant to aid in the construction of a wagon road. On pleas and demurrer to cross bill.

John H. Hall, U. S. Dist. Atty.

Dolph, Mallory, Simon & Gearin and Britton & Gray, for California & Oregon Land Co.

BELLINGER, District Judge. On July 2, 1864, congress granted to the state of Oregon, to aid in the construction of a wagon road from Eugene City, across the Cascade Mountains, to the eastern boundary of the state, alternate sections of public land, designated by odd numbers, for three sections in width on each side of such road. 13 Stat. 355. Prior to this act, on March 25, 1864, congress passed an act authorizing the president to conclude a treaty with the Klamath, Modoc, and Snake Indians, in Southeastern Oregon, for the purchase of the country occupied by them. 13 Stat. 37. In pursuance of this authority a treaty was concluded on October 14, 1864, with the head men of the Modoc and Snake Indian tribes. This treaty was ratified by the senate on July 2, 1866, with two amendments, consisting of mere verbal corrections, in no wise affecting the sense of the treaty; but the amendments resulted in a second convention with the Indians, held December 10, 1869. The senate amendments were ratified at this convention, and the treaty was proclaimed by the president February 17, 1870. By this treaty the Indian tribes ceded to the United States all their right, title, and claim to the country then occupied by them, with this proviso:

"Provided, that the following described tract, within the country ceded by this treaty, shall, until otherwise directed by the president of the United States, be set apart as a residence for said Indians, [and] held and regarded as an Indian reservation, to wit: Beginning upon the eastern shore of the Middle Klamath Lake, at the Point of Rocks, about twelve miles below the mouth of Williamson's river; thence following up said eastern shore to the mouth of Wood river; thence up Wood river to a point one mile north of the bridge at Fort Klamath; thence due east to the summit of the ridge which divides the Upper and Middle Klamath Lakes; thence along said ridge to a point due east of the north end of the upper lake; thence due east, passing the said north end of the upper lake, to the summit of the mountains on the east side of the lake; thence along said mountain to the point where Sprague's river is intersected by the Ish-tish-ea-wax creek; thence in a southerly direction to the summit of the mountain, the extremity of which forms the Point of Rocks; thence along said mountain to the place of beginning." 16 Stat. 708.

The treaty provided for annual money payments to be made to the Indian tribes, extending over a period of 15 years. It further provided for the payment for such articles as might be advanced to the Indians at the time of the signing of the treaty, for their subsistence during the first year after their removal to the reservation, the pur-

chase of teams, farming implements, tools, seeds, clothing, and provisions, and for the payment of the necessary employés. It was further provided that the United States would erect, at suitable points on the reservation, as soon as practicable after the ratification of the treaty, saw and flouring mills, suitable buildings for the use of a blacksmith, carpenter, and wagon and plow maker, buildings for one manual labor school, and such hospital buildings as might be necessary, and that it would keep these buildings in repair at the expense of the United States for the term of 20 years. Article 6 of the treaty provided as follows:

"The United States may, in their discretion, cause a part or the whole of the reservation provided for in article 1 to be surveyed into tracts and assigned to members of the tribes of Indians, parties to this treaty, or such of them as may appear likely to be benefited by the same, under the following restrictions and limitations, to wit: To each head of a family shall be assigned and granted a tract of not less than forty nor more than one hundred and twenty acres, according to the number of persons in such family; and to each single man above the age of twenty-one years a tract not exceeding forty acres. The Indians to whom these tracts are granted are guaranteed the perpetual possession and use of the tracts thus granted and of the improvements which may be placed thereon; but no Indian shall have the right to alienate or convey any such tract to any person whatsoever, and the same shall be forever exempt from levy, sale, or forfeiture: provided, that the congress of the United States may hereafter abolish these restrictions and permit the sale of the lands so assigned, if the prosperity of the Indians will be advanced thereby: and provided further, if any Indian, to whom an assignment of land has been made, shall refuse to reside upon the tract so assigned for a period of two years, his right to the same shall be deemed forfeited."

On the 24th of October, 1864, the state transferred the grant of lands provided for in the act of congress to the Oregon Central Military Road Company, a corporation incorporated under the laws of Oregon, for the purpose of taking the grant and building the road in question. By the wagon-road grant it was provided, in effect, that, when the governor of the state should certify to the secretary of the interior that any 10 continuous miles of said road were completed, a quantity of land, not exceeding 30 sections, might be sold by the company, and so on from time to time until said road was completed. On the 26th of December, 1866, congress passed an indemnity grant, extending 3 miles beyond the limits of the original grant on either side of the line of the proposed road. On the 27th of July, 1866, the governor of the state certified to the completion, in accordance with the requirements of the act of congress and the laws of Oregon, of the first continuous 50 miles of road, beginning at Eugene City. Thereafter, and on November 26, 1867, the governor of the state certified to the completion of the second section of the road for a distance of 42½ miles, and extending to Crescent Lake, in the valley of the Des Chutes. On the 17th of March, 1869, a map of the general route of the road over the Indian reservation, provided for in the treaty, to the eastern boundary of the state, was filed. The route thus located enters the reservation at its north boundary, continues thence south until near the south boundary, when it turns eastward and leaves the reservation, after traversing it for a distance of more than 60 miles, as shown by the following map:

BOUNDARY BETWEEN OREGON AND CALIFORNIA.

There was a supplementary map of such location filed on the 28th of February, 1870, but this was merely for the purpose of correcting certain unimportant errors in the map first filed, and is of no importance in the case.

The land department, acting upon the assumption that the location of the company's road over the reservation made the grant effective as well within the limits of the reservation as without, certified such lands as inuring to the company under its grant, and in some instances upon these certificates patents have issued.   There were also certified and patented to the company lands without the reservation and indemnity limits of the road grant.   To cancel these certificates and patents, this suit is brought against the California & Oregon Land Company, which company has succeeded to the title of the Oregon Central Military Road Company through conveyances made in 1874 to B. J. Pengra, and by Pengra and wife to Colby and others, promoters and organizers of the California & Oregon Land Company, to which company, upon its organization, Colby and his associates conveyed the title so held by them.   A number of persons, purchasers of parcels of the lands in suit from the latter company, were made defendants in the suit, but as to these the bill has been dismissed upon the motion of the attorney for the United States.   To the bill of complaint the defendant company has filed a double plea, fortified by its answer, setting up the defense of a former adjudication in this court of the matters involved in this suit, and that of bona fide purchase for value, without notice.   The defendant road company also files its cross bill, praying that the United States, its officers and agents, be restrained and enjoined from proceeding to make allotments of the reserved lands among the Indians, or issuing to any of them any patent of any kind or character, and from placing in such Indians any possession of any of the lands, as it threatens to do, in compliance with the sixth article of the treaty in question.

The questions presented are:   Did the grant of July 2, 1864, attach to the lands reserved to the Indian tribes under the treaty of October 24, 1864, and so defeat the reservation, and destroy the Indian right of occupancy provided for in the treaty, and theretofore existing?   If not, and such right of occupancy still exists, has the legal title rightfully vested in the defendant company, subject to such right of occupancy, and is the company entitled to an order restraining the proposed allotment of these lands in severalty among members of the Indian tribes?   Is the defendant company entitled to the protection of a bona fide purchaser?   And is the government precluded in the prosecution of this suit by the adjudication had in the suit of the United States against the defendant to have a forfeiture of its grant decreed?    •

As to the first question, it is contended for the company that the grant of July 2, 1864, was a present grant, and was at once effective, so as to make any disposition of any land of the class described in the granting act unlawful, without reference to the time when the road was located or its map of route was filed, and that in any event the treaty with the Indian tribes did not take effect until proclaimed by the president on the 13th of February, 1870, and that the road grant

attached to the land in question by the location of its route and the construction of its road in 1869, if it had not done so prior thereto. It is true that congress may dispose of any part of the public domain to which the Indians' right of occupancy has not been extinguished, subject to that right. But, unless the grant is of a specific character, it must be presumed that congress does not intend to dispose of such portions of this domain as it may become necessary, in treating with the Indian tribes, to concede to their permanent use. There can be no treaty of cession without some reservation somewhere for this purpose. This reservation may, of course, be without the ceded territory; but this does not affect the question, since land grants are so common throughout the new country that no locality can altogether escape them, especially where the grants are floating ones. In this case the land-grant act prescribed no route for the proposed road, beyond the most feasible pass in the Cascade Mountains, near Diamond Peak. From this point it only required that the road should continue to the eastern boundary of the state. There were two other wagon-road grants through the wide domain known as "Eastern Oregon," passed July 5, 1866, and February 25, 1867; while on the west side of this range of mountains a railroad land grant, extending from Portland to the southern boundary of the state, reached across the valleys of the Willamette, Umpqua, and Rogue rivers, 30 miles in width, on either side of the Oregon & California Railroad, into the Cascade range, upon the one hand, and the Coast range, on the other. There were still other grants, not necessary to be mentioned in this connection.

Under such circumstances, one of two things is inevitable: The government could, in the pursuit of its "ancient and honored policy," establish in the territory subject to these floating grants permanent Indian reservations, leaving enough available lands to satisfy the grants; or else its sovereign authority in dealing with the Indian tribes could only be exercised in conformity with the interests and wishes of its grantees in these grants. There is not in such cases, as there was not in this case, any impairment of the grant. The reservation in question was directly south, and distant some 30 miles, from the point where the road crossed the Cascade Mountains. Enough lands remained without the reservation to satisfy the grant many times over. The reservation appears not to have been an obstacle in the road's way. It is suggestive that the line of route adopted by the road company, as stated by Indian Agent Dyar in a letter attached to the report of a committee of congress, referred to in the argument in this case, "runs diagonally through the whole length of the Klamath reservation, a distance of sixty miles or more, traversing the very best portions of the same,—in fact, is so located as to embrace within the limits of the six miles in breadth more than one-half of all the land upon the reserve suitable for cultivation or for winter grazing." To satisfy the claims of the road company, it must be held that the road grant, until the filing of its map of route east of the Cascade Mountains, five years after the granting act was passed, covered all of the then undisposed of public domain, and that until the convenience or interest of the road company prompted the location of its line the power of the United

States to dispose of any of these lands, or to provide for the Indian tribes thereon, was suspended. Congress could not have intended an act that involved such consequences. The duty of providing for these tribes was of the utmost importance. Not only did the development of the country depend upon it, but the peace of the country, as well. A combination of the Klamath, Modoc, Snake, and Piute tribes could, according to Agent Dyar (letter of October 16, 1873), at a single stroke destroy the sparse settlements of Southeastern Oregon, and, he might have added, the settlements of Northeastern California. The intrusion of white settlers into the territory inhabited by these jealous and warlike tribes made it indispensable that there should be a treaty of cession and reservation,—a thing impossible if it was within the power of the road company to float its grant in any direction, and attach it to the lands which had been in the meantime reserved, upon the assumption that its grant covered a practically limitless extent of country. The power of the government to conclude treaties with the Indians, and thereby provide permanent reservations for them, without reference to the existence of floating land grants, is as indubitable as the necessity that requires its exercise. The act of congress authorizing the treaty preceded the wagon-road grant. The treaty was concluded and ratified by the senate three years before the map of location of the road over the reservation was filed. There were two so-called amendments made by the senate, which resulted in a second convention. But these were only amendments in name. They were not amendments in any proper sense of the word, but mere verbal corrections, in no way affecting the sense of the treaty. The word "guaranteed" had inadvertently been used in two places in the treaty,— once in the provision permitting agents, employés, and army officers to be upon the reservation, where it had no meaning whatever, and once where it was used, instead of the word "reserve," in a provision reserving rights of way across the reservation for roads. The treaty was therefore, to all intents and purposes, ratified three years before the road company's map of location over the reservation was filed; and if the treaty was not then, and until the president's proclamation was issued, binding upon the parties to it, it was nevertheless a provisional disposal of the reserved lands, and was effective to withdraw them from the operation of the grant or other disposition. It does not admit of question that it was not within the power of the road company to defeat the treaty after its ratification by the senate, nor, for that matter, prior thereto, by so locating its line of road as to appropriate more than one-half of all the lands upon the reserve suitable for cultivation or for winter grazing. It must be borne in mind that the rights of the Indian tribes under the treaty were rights reserved in their cession to the government. This right has been declared by the supreme court of the United States to be a title,—a right "as sacred as that of the United States to the fee. This right of use and occupancy by the Indians is unlimited. They may exercise it at their discretion. If the lands in a state of nature are not in a condition for profitable use; they may be made so. If desired for the purpose of agriculture, they may be cleared of their timber to such an extent as may be reasonable under the circumstances. The timber taken

off by the Indians in such clearing may be sold by them." U. S. v. Cook, 19 Wall. 593, 22 L. Ed. 210. As stated in Land Co. v. Worden (C. C.) 85 Fed. 96, for all purposes, save only that of private sale, the Indians were in fact the owners of these lands.

It is contended that the Indians ceded all their right, title, and claim to the country occupied by them, and that the rights provided for in the reservation were new rights conferred by the treaty, which did not take effect until proclaimed by the president in 1870; that the road grant had attached in the meantime. The proviso in the treaty was a reservation in the cession made by the Indians. Land Co. v. Worden, supra. There is no doubt about this, and, if there was, that doubt ought to be resolved in favor of the Indians, upon the principle that such an instrument must be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians, since they are "a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States." Jones v. Meehan, 175 U. S. 11, 20 Sup. Ct. 1, Adv. S. U. S. 1, 44 L. Ed. ——. This contention assumes that the treaty was effective to devest the Indians of all rights, including those expressly reserved by them, and constituting the consideration, in part at least, upon which their cession was made; that the rights ceded by the Indians in the treaty the United States and its grantees, including the road company, acquired, while those reserved by the Indians the United States and its grantees, including the road company, also acquired. This opinion was apparently held by committees of congress and officers of the land department, the commissioner of Indian affairs, and by two governors of Oregon, as appears from reports made by the public land committee of each house of congress, to which reference is made in the brief submitted in the road company's behalf. The governor of California, in a letter to the land department, in the interest of the stockholders of the road company, who are citizens of that state, expressed the same opinion. There was one serious difficulty in giving effect to the view so respectably held. The report of the house committee on public lands, submitted January 28, 1879, reporting against the right of the Indian tribes to the lands reserved in the treaty, says:

"But apprehensions of serious conflicts with the Indians have prevented affirmative action. These reservation Indians are jealous and warlike. They made their treaty with the United States in good faith, they were without notice of any prior grant, and they naturally regard the title to the reservation as exclusively their own by virtue of the treaty of 1870. If they are made to understand that the United States had granted to individuals the title to these lands six years before it was stipulated by solemn treaty to set the same apart for them, their confidence in the government will be impaired, and attempted removal will occasion most serious conflicts. It may be conceded that an attempt to remove the Indians would be so dangerous to the peace of Southern Oregon and Northern California that less violent measures of settlement should be adopted, if the same can be lawfully found."

These jealous and warlike natives could not be made to understand that they only were bound by the treaty; that what they ceded in the

treaty the white people acquired, and what they reserved the white people also acquired. The Oregon secretary of state visited these Indians to ascertain their temper in the premises. In his letter, which is appended to the committee's report, he expresses apprehension of trouble, and says, with unconscious humor, that "an Indian does not understand a mistake when it is made against him by whites." The difficulty of making an uncivilized and warlike community understand a mistake by which they were devested of their rights in favor of the party making the mistake is obvious. That these tribes were not ejected from these lands, always in their possession, reserved to them by treaty, improved by the government for them in pursuance of the treaty, and without which, according to Indian Agent Dyar, "the only hope of their ever becoming self-supporting" would be gone, is, therefore, not due to the justice of the government, but to the fear that they would appeal from the justice of the civilized race to the tomahawk and scalping knife of the savage.

If the right of the Indians is a new right conferred by the treaty, it is prior to the road grant, which was still a "float" subsequent to the time when the treaty became operative. The treaty took effect long prior to the president's proclamation in 1870. By several acts of congress, approved July 26, 1866, March 2, 1867, July 27, 1868, and April 10, 1869, appropriations aggregating more than $122,000 of public money were made in fulfillment of the stipulations of the treaty. Included in these appropriations was one for $35,000 made by the first of these acts for the subsistence of these Indians during the first year after their removal to the reservation, and for the purchase of teams, farming implements, tools, seeds, etc. The same act made further appropriations of $11,300 for the erection of a saw mill, flouring mill, buildings for blacksmith, carpenter, and wagon and plow maker, necessary buildings for one manual labor school and for hospital buildings, and $4,000 for the erection of agency buildings, required by the treaty to be erected at some suitable point on the reservation as soon as practicable after the ratification of the treaty. There were further appropriations by this act of $1,500 for the purchase of tools, materials, stationery, etc., "for the fiscal year ending June 30, 1867," $6,000 for salaries and subsistence of various employés, and $3,600 for salaries of physician, miller, and school teachers, each for the fiscal year ending June 30, 1867. By each of the several acts of 1867, 1868, and 1869, there were appropriations, among others, for keeping these various buildings in repair. All these appropriations were, in terms, in fulfillment of the treaty described as the treaty of October 14, 1864. And these acts of congress show conclusively that if the Indian tribes were not removed to the reservation until after the president's proclamation in February, 1870, as alleged, at least the various mills and shops and the buildings for a manual labor school and hospital were erected "at some suitable point on the reservation" long prior thereto, and that three annual appropriations of $1,000 each had been made for repairs of these buildings, and that seeds and tools were purchased, and employés and teachers, etc., were paid salaries, and subsisted on the reservation, during the same time. There can be no more authoritative ratification of the treaty than its execution by congress and the

president, and the president's proclamation in 1870 was a delayed formality, not necessary to give effect to the treaty that had been in operation during the three previous years. By these appropriations and improvements and repairs there was a segregation of the reserved lands from the public domain, and a permanent appropriation of them, long before the road company located its route across the reservation, or had turned from its easterly course south in that direction. There is, furthermore, a conclusive presumption from these acts of congress that the Indian tribes were in the meantime located on the reservation, although the fact, if material, must, in the state of the pleadings, be assumed to be otherwise.

It is alleged in the answer filed in support of the plea that the road was fully completed through the reservation in 1866. But it is clear that the pleader intended this date for 1869. The governor certified to the completion of the second section (42½ miles) of road on November 26, 1867, and this section extended no further than Crescent Lake. The north boundary of the reservation was still more than 30 miles distant, so that the line from Crescent Lake through the reservation would be probably 100 miles in length. It is inconceivable that the certification of completed road would have stopped at Crescent Lake at the end of 1867, if 100 more miles of road had in fact been completed in 1866, or that the map of location through the reservation would not have been filed until 1869. In the brief filed for the company in the case of Land Co. v. Worden, supra, it is stated that the road company had built its road on and over the reservation, and filed its map of definite location, more than two months before the second convention with the Indian tribes was held. That convention was held on December 10, 1869.

It is insisted that, if the treaty was effective to reserve the lands set apart for reservation to the use of the Indian tribes, nevertheless the road company is entitled to the fee, subject to that use. As to this, I repeat that it must be presumed that congress did not intend to create any interest in land set apart to the permanent use of the Indian tribes. The intention to bestow the fee subject to the burden of the Indian occupation must necessarily refer to the temporary character of that occupation. Here the treaty provides for allotment of the reserved lands, and guaranties to the allottees the perpetual possession and use of the tracts so granted, reserving to the United States the right of sale for the benefit of the Indians whenever their prosperity will be advanced thereby. This leaves nothing to be taken cum onere, and where there is nothing there is no fee.

The defendant relies upon the defense of a bona fide purchase. It is alleged that at the time of the transfer to the defendant corporation of the lands in question by B. J. Pengra and wife, grantees of the Oregon Central Military Road Company, neither the present company, nor any of its officers, agents, or stockholders, had any notice or reason to believe or suspect that its grantors were not, at the time of the execution and delivery of the several deeds, actual owners, in good faith, of the lands so conveyed; that said purchasers relied upon the certified lists, and upon the statements and rep-

resentations therein made by the commissioner of the general land office and the secretary of the interior that the lands described in such lists had been duly and legally granted to the state of Oregon, and had been duly and legally earned by the Oregon Central Military Road Company. The defendant admits that it had constructive notice of the several acts of congress pleaded in the bill of complaint, and of the laws in regard to the public lands of the United States and the disposal thereof. And it had more than this. It had notice of the provisions of the treaty, since its right of possession to all the lands inuring to it under the grant depended upon that treaty. The rule is elementary that:

"Wherever a purchaser holds under a conveyance, and is obliged to make out his title through that deed, or through a series of prior deeds, * * * he has constructive notice of every matter connected with or affecting the estate which appears, either by description of parties, by recital, by reference, or otherwise, on the face of any deed which forms an essential link in the chain of instruments through which he must derive his title. The reasons for this doctrine are obvious and most convincing. In fact, there could be no security in land ownership unless it were strictly enforced." 2 Pom. Eq. Jur. § 626.

All persons dealing with lands claimed under this road grant are presumed to have notice of the treaty by which the Indian right of occupancy to these lands was extinguished. Moreover, there were valuable improvements upon that part of the reservation now claimed by the road company, made by the government, for the benefit of the Indians, under the treaty. Dyar, in a letter of September 20, 1873, which is appended to the report of the congressional committee hereinbefore mentioned, says, "A part, at least, of the government farm and improvements at Yainax station is on the land claimed by the company." The reservation was then occupied by the Indian tribes as a reservation. The conveyance by the military road company, through Pengra and Colby and associates, to the California & Oregon Land Company, was in 1874. Congress had been for nine years making large appropriations for public reservation buildings and repairs, etc., on the reservation. Such a thing as a purchase without notice under such circumstances is impossible; nor is there such thing possible as a bona fide purchase of land in the notorious possession of the true owner, with a title of record.

As to the lands without the limits of the grant, I am of the opinion that the plea of bona fide purchase should be allowed. A purchaser desiring to purchase lands to which the company has a patent, or a certificate upon which patent issues, cannot be expected to know, nor to employ a surveyor to find, the precise limits of the grant. He may reasonably act upon the assumption, nothing appearing to the contrary, that the proper officers of the land department have ascertained the fact. It is not, in such a case, a question of law, but one of fact, proved by the public surveys and records of the land office in the keeping of its officers.

As to the plea of former adjudication, it is enough to say that the causes of action in the two suits are not the same, and that the points in controversy are not the same. The former action was in pursuance of an act of congress passed for the purpose of having

forfeitures decreed of certain wagon-road grants, the grant to the Oregon Central Military Road Company included. The title of that act was, "An act providing in certain cases for the forfeiture of wagon road grants in the state of Oregon." Act March 2, 1889. By the terms of the act it was made the duty of the attorney general to cause suits to be brought "to determine the questions of the seasonable and proper completion of said roads in accordance with the terms of the granting acts, either in whole or in part, the legal effect of the several certificates of the governors of the state of Oregon of the completion of said roads, and the right of resumption of such granted lands by the United States, and to obtain judgments, which the court is hereby authorized to render, declaring forfeited to the United States all of such lands as are coterminous with the part or parts of either of said wagon roads which were not constructed in accordance with requirements of the granting acts, and setting aside patents which have issued for any such lands, saving and preserving the rights of all bona fide purchasers of either of said grants or of any portion of said grants for a valuable consideration, if any such there be." 25 Stat. 850. None of these questions touch any matter in controversy in the present suit. In the former suit the questions presented were: Was the government imposed upon by false and fraudulent certificates of the governor of Oregon certifying to the seasonable construction of the road? And did the company purchase in good faith in reliance upon the bona fides of such certificates? Here the question is not one of the right of the company to the grant, but of the inclusion of certain lands within the grant. It is true that in the former suit there was a specific description of the lands involved, but that was merely a method of describing the grant. There was in that case no question of Indian rights, of the effect to be given to the treaty with the Indian tribes of Southeastern Oregon and Northeastern California, of the time when that treaty became effective, and of its effect to exempt the lands reserved by it from the operation of the grant. In this case there is no question of the seasonable construction of the road, or of fraud practiced upon the United States by false certificates of its completion. There was no single question common to both suits. In their scope and purpose, they were and are totally different, and the interest for which this suit is brought and the right in which the United States appears are different from those involved in the former suit. These cases do not admit of the application of the principle of finality of judicial decision. That principle is a salutary one, not a snap judgment. The demurrer to the cross bill of the defendant the California & Oregon Land Company is sustained, and its pleas are overruled, except only as to so much of the plea of bona fide purchase as relates to land alleged to be without the limits of the company's land grant.