Littleton, Judge,
delivered the opinion of the court:
The Jurisdictional Act, under which this suit was instituted, was approved March 3, 1927, 44 Stat. 1349. It conferred jurisdiction upon this court, with right of appeal to the Supreme Court by either party, to hear, examine, adjudicate, and render judgment in any and all legal and equitable claims which the Shoshone Tribe of Indians of the Wind River Reservation in the State of Wyoming might have against the United States arising under or growing out of the Treaty of July 3,1868, or arising under or growing out of any subsequent treaty or agreement between said Shoshone Tribe and the United States or any subsequent act of Congress affecting the tribe which claims have not heretofore been determined and adjudicated upon their merits by this court or the Supreme Court. In section 3 it was provided that “In said suit the court shall also hear, examine, and adjudicate any claims which the United States may have against said tribe, but any payment, including gratuities which the United States may have made to said tribe, shall not operate as an estoppel but may be pleaded as an offset in such suit: Provided, however, That the United States may interpose to such suit or action any and all pleas of defense, affirmative and negative, legal and equitable, *359 which it may have thereto not herein specifically barred by the provisions of this act. In reference to all claims which may be the subject matter of the suits herein authorized, the decree of the court shall be in full settlement of all damages, if any, committed by the Government of the United States, and shall annul and cancel all claim, right, and title of the said Shoshone Indians in and to such money, lands, or other property.”
The questions now involved in this case are (1) the value on March 19,1878, of the property rights of the plaintiff in and to one-half of a reservation of 2,343,540 acres of land, known as the Shoshone - or Wind River Reservation, in the State of Wyoming taken by the government on the date mentioned for the Northern Arapahoe Tribe of Indians; (2) the amount to be added to such value necessary to the award of just compensation.
The property taken by the government consisted of a one-half undivided interest in the entire reservation, or 1,171,770 acres. For this plaintiff contends for a value of $1.75 an acre, or $2,050,597.50 on March 19, 1878, and an additional amount as a part of just compensation at the rate of 7 percent per annum to date of payment. As further damages plaintiff contends for an allowance of 87y2 cents an acre to the remainder of the reservation on the ground that the Arapahoes were placed on and given the most valuable portion. From the total of these amounts plaintiff deducts the total allowable disbursements made by the government for the benefit of plaintiff tribe from 1878 to June 30, 1934, the date on ivhich the evidence of accounting between the government and the plaintiff tribe ended, and asks judgment for the balance, which it computes as $13,923,509.57, as follows:
Reasonable value of a one-half undivided interest_$2, 050', 597. 50
Damages to remaining one-half interest at 87% cents 1, 025, 298. 75
Additional amount measured by interest at 7 percent per annum- 12, 703,451. 51
Total of other amounts allowed by Court_ 100,395.49
15, 879, 743.25
Less offset- 1,956, 233. 68
Balance due to date of judgment. 13, 923, 509. 57
*360 Counsel for the defendant contend that the only rights of plaintiff in and to the reservation specified in the Treaty of July 3,1868, which may be considered in arriving at the just compensation to which the tribe may be entitled because of a taking by the government of a one-half undivided interest in the reservation for the Arapahoe Indians were the rights to live upon the reservation, to use such materials thereon as might be necessary for building and farming-purposes and for the purpose of carrying on farming operations thereon, and that no consideration whatsoever should be given by the court in fixing the amount of just compensation to any value existing in March 1878 for the value of land, as such, or for the timber or mineral content of the land. On this theory counsel contend that the value of the property rights taken was approximately 4 cents an acre, or $46,000, to which should be added 5 percent per annum. In the alternative, it is contended that, in any event, the value of the property rights of plaintiff tribe did not exceed $469,000, arrived at on the basis of $25 for each Arapahoe Indian, or $23,450 for the entire population of the tribe in March 1878 capitalized at 5 percent per annum. This total of $469,000 amounts to approximately 40 cents an acre for 1,171,770 acres. In support of the contention that the extent of the property rights of plaintiff tribe consisted merely of the right to live upon the reservation, counsel for the defendant rely upon the case of United States v. Cook, 19 Wall. 591, and subsequent cases involving the same or similar questions, namely, whether individual Indians upon a reservation had a right to cut and sell timber from the reservation and retain the proceeds and otherwise deal with the tribal property as a private owner might do. We shall discuss that case later in the opinion. It is also argued that the Supreme Court in the case at bar, 299 U. S. 476, affirmed the rule contended for by the government in the following language: “Confusion is likely to result from speaking of the wrong to the Shoshones as a destruction of their title. Title in the strict sense was always in the United States, though the Shoshones had the treaty right of occupancy, with all its beneficial incidents. United States v. Creek Nation, supra, p. 109. What those incidents are, it is needless to consider *361 now. Cf. United States v. Cook, 19 Wall. 591; Pine River Logging Co. v. United States, 186 U. S. 219; United States v. Paine Lumber Co., 206 U. S. 467.” In that statement the court was discussing the contention of plaintiff tribe that the taking of their property occurred in March 1927 upon the passage of the Jurisdictional Act authorizing this suit to be brought, for the reason that this act destroyed their title to one-half of the reservation. We think it is clear that the court did not intend to hold as counsel for defendant now contend, but reserved the question of the character and extent of the property rights of an Indian tribe in and to a reservation specified and set apart by a treaty, inasmuch as the case was being remanded for consideration and determination of just compensation to which the plaintiff tribe was entitled as of March 1878. Following the quotation above mentioned, the court also said: “The right of occupancy is the primary one to which the incidents attach, and division of the right with strangers is an appropriation of the land pro tanto, in substance, if not in form.” Article 2 of the Treaty of July 3,1868, provided that the reservation in question “is set apart for the absolute and undisturbed use and occupation of the Shoshone Indians * * *; and the United States now solemnly agrees that no persons except those herein designated [the Shoshones] and authorized so to do, and except such officers, agents, and employees of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article for the use of said Indians, and henceforth they will and do hereby relinquish all title, claims, or rights in and to any portion of the territory of the United States except such as is embraced within the limits aforesaid.” We are of opinion that this right to “absolute and undisturbed use and occupation” of the reservation includes, as beneficial incidents, the net value of the land, including the net value of any timber or minerals within the boundaries of the reservation, and, so far as we have been able to ascertain, this view is consistent with the established policy of the government from the beginning of its dealings with the Indian tribes, the making of treaties providing reserva *362 tions for them, and in the management of tribal lands and other affairs of the Indian tribes at least for several years prior to 1878 and at all times subsequent thereto. Reference to various treaties and cession agreements at very early dates when the government ivas endeavoring to locate all Indian tribes upon definitely defined reservations does not overcome this conclusion. Instances can be found where commissioners dealing with Indian tribes secured agreements ceding lands for small amounts on a “per acre” basis, but, standing alone, these transactions indicate nothing more than that perhaps the Indian tribes concerned were paid or allowed much less than the amount to which they were really entitled. Iowa. Tribe of Indians v. United States, 68 C. Cls. 585. Other transactions of a similar nature can be found where much larger amounts per acre were paid, and where, in arriving at the amounts paid to the Indian tribes concerned, consideration was given to the value of the land, as such, and all that went with it.
The nature of the Indian title has been discussed in many cases. In Worcester v. State of Georgia, 6 Pet. 515 (1832), the court said, “* * * Their right of occupancy has never been questioned, but the fee in the soil has been considered in the government. This may be called the right to the ultimate domain, but the Indians have a present right of possession.”
Again, in Mitchel v. United States, 9 Pet. 711, 746 (1835), it was said:
Indian possession or occupation was considered with reference to their habits and modes of life; their hunting-grounds were as much in their actual possession as the cleared fields of the whites; and their rights to its conclusive enjoyment in their own w’ay and for their own purposes were as much respected, until they abandoned them, made a cession to the government, or an authorized sale to individuals. * * *
* * * it is enough to consider it as a settled principle that their right of occupancy is considered as sacred as the fee-simple of the whites.
In Holden v. Joy, 17 Wall. 211, 244 (1872), the court held as follows:
Throughout, the Indians, as tribes or nations, have been considered as distinct, independent communities, *363 retaining their original natural rights as the undisputed possessors of the soil, from time immemorial, subject to the conditions imposed by the discoverers of the continent, which excluded them from intercourse with any other government than that of the first discoverer of the particular section claimed. They could sell to the government of the discoverer, but they could not sell to any other governments or their subjects, as the government of the discoverer acquired, by virtue of their discovery, the exclusive preemption right to purchase, and the right to exclude the subjects of all other governments, and even their own, from acquiring title to the lands.
Enough has already been remarked to show that the lands conveyed to the United States by the treaty were held by the Cherokees under their original title, acquired by immemorial possession, commencing ages before the New World was known to civilized man. Unmistakably their title was absolute, subject only to the preemption right of purchase acquired by the United States as the successors of Great Britain, and the right also on their part as such successors of the discoverer to prohibit the sale of the land to any other governments or their subjects, and to exclude all other governments from any interference in their affairs.
In United States v. Cook, supra (1873), on which counsel for defendant rely, the controversy concerned the ownership ■of logs cut from the Oneida Indian Reservation in Wisconsin by a member of the tribe for the sole purpose of sale. In Bolding, as had always been held, and as was clearly stated in Holden v. Joy, supra, that the Indians in possession of a reservation had only a right of occupancy in the land, that the fee is in the United States, and that the Government had the power to manage the property and affairs of the tribe, the court decided that the members of the Oneida Tribe had no right to cut the timber on the land solely for the purpose of sale; that to do so was waste as in the case of the cutting of timber by a trespasser; and that the United States as the owner of the fee became the owner of the logs. In reaching its conclusion, the court said that “The right of the Indians to their occupancy is as sacred as that of the United States to the fee.” Page 593. And further, that—
This right of use and occupancy by the Indians is unlimited. They may exercise it at their discretion. If the lands in a state of nature are not in a condition *364 for profitable use, they may be made so. If desired for the purposes of agriculture, they may. be cleared of their timber to such an extent as may be reasonable under the circumstances. The timber taken- off by the Indians in such clearing may be sold by them. . But to justify any cutting of the timber, except for use upon the premises, as timber or its product, it must be done in good faith for the improvement of the land. The improvement must be the principal thing, and the cutting of the timber the incident only. Any cutting beyond this would be waste and unauthorized.
The timber, while standing, is a part of the realty, and it can only be sold as the land could be. The land cannot be sold, by the Indians, and consequently the timber, until rightfully severed, cannot be. It can be rightfully severed for the purpose of improving the land, or the better adapting it to convenient occupation, but for no other purpose. When rightfully severed it is no longer a part of the land, and there is no restriction upon its sale. Its severance under such circumstances is, in effect, only a legitimate use of the land.
In that case two points were.decided: first, it was decided by analogy to the law relating to the respective rights of life-tenant and remainder-man, that the Indians have no right to cut the timber on an Indian reservation for the purpose of sale only; that to do so is waste, and that the title to timber so cut vests in the United States as the owner of the fee or “ultimate domain”; second, that the Indians have an exclusive right of use and occupancy of tmlimited duration, and the right to cut the standing timber during the whole period of such occupancy not only for use upon the premises but “for the purpose of improving the land or the better adapting it to convenient occupation”; also the right to sell all timber cut for the latter purpose. It is clear therefore that this decision did not hold that the government had the right to cut or dispose of the timber on Indian Reservations, or to sell Indian lands for its own use and benefit without accounting therefor to the Indian tribe. When a reservation is definitely set apart for an Indian tribe by treaty or statute, the Government has only the right and power to control and manage the property and affairs of the Indians in good faith for their betterment, *365 but, as stated by the court in Shoshone Tribe of Indians v. United States, 299 U. S. 476:
Power to control and manage the property and affairs of Indians in good faith for their betterment and welfare may be exerted in many ways and at times even in derogation of the provisions of a treaty. Lone Wolf v. Hitchcock, 187 U. S. 553, 564, 565, 566. The power does not extend so far as to enable the Government “to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation * * *; for that ‘would not be an exercise of guardianship, but an act of confiscation.’ ” United States v. Creek Nation, supra, p. 110, 113; * * *.
Government counsel argue here that United States v. Cook, supra, decided that the interest of the Indians in the reservation lands and timber thereon is that of a life-tenant and no more. In that case the court did say that “What a tenant for life may do upon the lands of a remainder-man the Indians may do upon their reservations, but no more.” But in thus comparing the position of the Indian with that of a life-tenant for the purpose of stating what the Indians may or may not do on their reservations, we think the court did not intend definitely to hold that the interest of the Indians in the lands of their reservations is only that of a tenant for life. Such a holding would have been in conflict with the statement of the court after reviewing prior cases concerning the nature of Indian title, that the Indians have the right of use and occupancy of unlimited duration. We think also that the contention of counsel for defendant is inconsistent with the holding of the Supreme Court in the case at bar — that the power of the government to control and manage the property and affairs of the Indians in good faith for their betterment and welfare does not extend so far as to enable the government to give the land to others or to appropriate them to its own purposes.
The case of Leavenworth, et al. R. R. co. v. United States, 92 U. S. 733, 742 (1875), arose under the Treaty of June 2, 1825, between the United States and the Osage Tribe of Indians; that treaty (7 Stat. 240) reserved for the occupancy *366 of the Indians for an unlimited period a tract of land lying within the boundaries of what subsequently became the State of Kansas. By an act approved March 3, 1863 (12 Stat. 712), Congress granted to the State every alternate section of land on each side of a projected line of the railroad to aid in its construction. The state assigned the grant to the plaintiff in error. The line of the proposed railroad traversed part of the reservation of the Osage Indians. By a Treaty of January 21, 1867, the Indians ceded ,a part of their reservation to the government, including the part through which this railroad passed. The question before the court was whether the grant made by the Act of March 3, 1863, supra, included the interest of the United States in the sections of land contiguous to the railroad in the Osage Reservation. It was held that this could not have been intended for the reason, among others, that the interest of the United States was only an “ultimate fee”, subject to a “perpetual right of occupancy” in the Indians, and, therefore, would have been of no immediate practicable benefit for the purpose of the grant. In discussing the ■nature of the Indian title, the court said:
As long ago as in Cherokee Nation v. Georgia, 5 Pet. 1, this court said that the Indians are acknowledged to have the unquestionable right to the lands they occupy, until it shall be extinguished by a voluntary cession to the Government; and, recently, United States v. Cook, 19 Wall. 591, that right was declared to be as sacred as the title of the United States to the fee. * * * This perpetual right of ooeupanoy, with the correlative obligation of the Government to enforce it, negatives the idea that Congress, even in the absence of any positive stipulation to protect the Osages, intended to grant their lands to a railroad company, either absolutely or cum ■onere. For all praetioal purposes, they owned it; as the actual right of possession, the only thing they deemed of value, was secured to them by Treaty until they should elect to surrender it to the United States. In the free exercise of their choice, they might hold it forever; and whatever changed this condition, or interfered with it, violated the guaranties under which they had lived. [Italics ours.]
*367 See, also, Beecher v. Wetherby, 95 U. S. 517, 525, 526, and also 34 Ops. Atty. Gen. 171,181, in which it was held, on the question whether the Indians’ rights of occupancy and use included any right to the hidden and latent resources of land, as follows:
If a transfer by the United States would convey only the naked fee, it goes without saying that the comflete equitable froferty toas in the Indians. The earlier and fundamental decisions make this plain. In Worcester v. Georgia, 6 Pet. 515, 544, 545, Chief Justice Marshall clearly states that the right asserted in behalf of the discovering European nations was merely a right, as against each other, which he defines as “the exclusive right of purchasing such lands as the natives were willing to sell.” As late as 1872 the Supreme Court said: “Unmistakably their title was absolute, subject only to the preemption right of purchase acquired by the United States as the successors of Great Britain, and the right * * * to prohibit the sale of the land to any other governments or their subjects” (Holden v. Joy, 17 Wall. 211, 244). [Italics ours.]
The position of counsel for the government is that this opinion of the Attorney General did not rule on the question of the Indians’ rights in the natural resources of their reservations, but only expressed an inclination, as shown by the statement that “If it were necessary here to decide as between these opposing views I should incline strongly to the latter.” This position is based, we think, on an erroneous interpretation of what the opposing views were to which the Attorney General referred. They were not whether in 1924 the Indian tribes had a mere right to use and occupancy or the equivalent of a fee-simple title to their reservation, but, as shown in the same paragraph of the opinion, they were whether the Indians’ interest in the natural resources of their reservations was bestowed upon them by the grace of Congress or whether it was a preexisting right. P. 180. On either theory, the Indians at the time in question were the beneficial owners of these resources, and the Attorney General so held. Inasmuch as either theory supported his conclusion it was not necessary, as he said, to *368 decide between them, but he expressed the clear preference for the view that the Indians’ beneficial ownership of the natural resources of their reservations was a preexisting or treaty right, and that the acts of Congress merely recognized and confirmed it, adding, “Support for tins- view is found in many expressions of the courts”, some of which, as we have seen, he then proceeded to cite. Pp. 180-181.
Again in an opinion relating to the rights in standing timber on lands of the White Mountain Apache Indian Reservation, a reservation created by Executive Order, which had been subsequently included in a forest reservation proclaimed by the President under authority of an act of Congress, the Attorney General, 29 Ops. A. G., 239, 244, said:
From the character of the legislation so passed in review,[1] there can be little doubt that in the mind and policy of Congress this reservation was not only a valid reservation set apart for the occupancy and enjoyment of the various tribes which have inhabited it from the beginning, and subject to be allotted in part to the individual members composing them, but was also devoted to them in its entirety in such a sense that no part of it should be taken from them without their consent or giving something in return by way of compensation. And, of course, no distinction here is to be taken between the land and the timber growing upon it and, presumably, constituting its chief vdhie. (U. S. v. Cook, 19 Wall. 691.) [Italics ours.]
The decisions cited establish, first, that the Indians have the right of possession and absolute use and occupancy in perpetuity until voluntary abandonment, subject to the power of the United States to control and manage the property and affairs of the Indians for their betterment and welfare, and that the beneficial incidents of this right of perpetual possession and absolute use and occupancy consist of the net value of the land, including any timber or *369 minerals upon the reservation. In other words, the beneficial interest belongs to the Indians. Second, that the United States has a naked fee and the right to the ultimate domain which gives it the right to prevent waste and to recover the proceeds of anything severed from the land by acts constituting waste, and also the right to control alienation of the Indians’ interest, but nothing more unless the Indians should abandon possession, in which event the right of possession would attach to the fee.
Acts of Congress relating to the disposition of Indian lands likewise recognize, we think, that the beneficial interest in the lands of an Indian reservation, including standing timber, mineral deposits, etc., belongs to the Indians.
Prior to the Act of March 3, 1883 (22 Stat. 582, 590), numerous acts of Congress relating to Indian lands dealt with each tribe separately. Prior to 1811 the disposition of Indian lands was handled by treaties and agreements made with the Indians by the executive department of the government subject to ratification by Congress. An examination and study of many cession agreements, made at very early dates in the history of the relationship between the Indian tribes and the government, disclose that scant consideration was given by the commissioners, acting on behalf of the government, to the actual value of the possessions of the Indians. As was said by this court in Blackfeet Indians v. United States, 81 C. Cls. 101, 136, that—
Few, if any, Indian treaties disclose a bargain and sale of the Indians’ lands upon the strict commercial basis observed in ordinary transfers of landed property. For this reason the court is firmly convinced that an established value applicable in all cases is not available to the parties as a precedent. Too many factors varying with respect to the case to be adjudicated enter into the issue to warrant the court in sustaining a fixed value upon the theory that the sum claimed is the same sum fixed in some prior litigation.
In 1863 and 1891 Indian lands were sold at $1.25 and $2.50 an acre. Sisseton & Wahpeton Bands of Sioux Indians v. United States, 58 C. Cls. 302. The annual report of the Secretary of the Interior for 1879, Serial 1910, page 454, *370 shows the amounts received for the sale of Indian lands during the year ending June 80, 1879, as follows:

Name Acres Amount

Cherokee- 80.07 100. 09
Sioux_ 12, 929.08 16,189. 34
Sac and Fox- 2, 398.15 8,140. 51
Ote and Hissouria_ 37, 777.20 73, 718. 05
Pawnee_ 30', 383. 66 40, 751.95
Osage ceded_ 15, 939. 00 112,114.98
Osage trust and diminished reserve- 205,709. 69 267,165. 22
Cherokee strip_ 30,400.73 38,001. 52
Winnebago- 40.00 120. 00
Shawnee absentee- 80. 00 200. 00
Total_ 335,737. 57 556, 501.66
The above tabulation, which embraces a large area of land in ten Indian reservations located in several states, shows an average sales price of approximately $1.65 an acre.
From 1871 many acts were passed by Congress dealing with reservation lands of various Indian tribes. The Act of February 6, 1871, 16 Stat. 404, sections 1-4, relating to the lands of the Stockbridge-Munsee Tribe of Indians in the State of Wisconsin, provided for an appraisement and the sale of a portion of their reservation, including timber, the net proceeds of such sales to be paid to or deposited to the credit of the Indians. No instance is cited where the government, through either the Executive or Legislative Departments, ever took a position or expressed a definite policy that the rights and interests of Indian tribes in and to reservations described and given to them by treaties, acts of Congress, or Executive Order were other than the rights and interest of a beneficial owner prior or subsequent to 1871. The established course of conduct has been that the Indians were entitled to all net proceeds from lands, timber, etc., not as a gratuity but as of right. In other words, the position of the government and the Indian tribes has ever been that the primary right of Indian tribes to the absolute and undisturbed use, occupancy, and possession of their reservations carried with it, as beneficial incidents, an interest in the lands, as such, and timber, etc., embraced within the reservation, and the right to have the net proceeds de *371 rived from the control and management of their properties by the government held and used in good faith for their benefit, betterment, and welfare. It seems clear that no other conclusion is justified under the established principle that the United States stands in the position of guardian for the Indians and is without power to give the tribal lands to others or to appropriate them to its own purposes without payment of just compensation. Shoshone Tribe of Indians v. United States, supra; United States v. Creek Nation, 295 U. S. 103, 110; Lane, et al. v. Pueblo of Santa Rosa, 249 U. S. 110, 113; Cherokee Nation v. Hitchcock, 187 U. S. 294, 307-308. This consistent policy in the construction of Indian treaties was, prior to 1883, definitely expressed in specific acts of Congress relating to Indian reservations and the proceeds from resources thereon, and in 1883 (22 Stat. 582, 590), and subsequently, was expressed in acts of Congress of general application to all Indian reservations. Counsel for the defendant argue that these acts of Congress relating to lands, timber, etc., within the boundaries of Indian reservations, which acts in great number prior to 1883 concerned specific reservations, and thereafter applied to all Indian reservations generally, gave the Indians no greater property rights or interests in their reservations than they previously possessed or subsequently acquired by treaty or other method employed in setting apart a reservation for them. We agree in principle with this statement, but we cannot agree with the conclusion which counsel attempt to draw, namely, that these acts of Congress and the long-continued uniform practice of the government in its dealings with Indian tribes did not amount to a construction of Indian treaties and a recognition that, under a proper construction and in accordance with the intent and purpose of the parties, the Indian title of absolute and undisturbed use and occupancy carried with it an interest in the land and the net proceeds derived therefrom so long as they continued to hold, use, and occupy the reservation solemnly set apart for them by treaty. The right to any net proceeds derived from a reservation is, it seems to us, no more than a necessary incident to the property right of absolute and exclusive use and occupancy *372 which, it has been held, is a “perpetual right of occupancy”, Leavenworth, et al. R. R. Co. v. United States, supra; Spalding v. Chandler, 160 U. S. 394, 402-403; and “as sacred as that of the United States to the fee”, United States v. Cools, supra. Nor can we agree with counsel for the defendant in the further conclusion which they seek to draw from the same premise, i. e., that use and occupancy is only the right to live upon and cultivate the land, that the holding by the government in trust for the Indians and use for their exclusive benefit of all the net proceeds derived from the sale of Indian lands, timber, etc., and the products from Indian reservations constituted only the granting of a gratuity to the Indians which, if necessary, could be set up as a charge against the Indian tribe concerned. This last proposition advanced by counsel demonstrates, it seems to us, the weakness of the underlying premise that the Indian title consisted merely of the right to live upon a reservation. No attempt has ever been made to charge such funds against the Indians as reimbursable items or to include them as offsets in suits by the Indian Tribes to recover' for reservation lands taken by the government. In the case at bar such proceeds amounted for the period 1885 to 1927 to $1,628,744.56, and we are giving plaintiff judgment for such portion of such funds as were taken and used for the benefit of the Arapahoe Indians. The guardianship of the Federal Government over an Indian does not cease when an allotment of land is made and the allottee becomes a citizen of the United States. Bowling v. United States, 233 U. S. 528. The Congress of the United States has undertaken from the earliest history of the government to deal with the Indians as dependent people, and to legislate concerning their property with a view to their protection as such. Tiger v. Western Investment Co., 221 U. S. 286. No right which is actually conferred on the Indians can be arbitrarily abrogated by statute. Choate v. Trapp, 224 U. S. 665. The fact that Indians own property in fee simple and are citizens of the United States does not prevent the Congress having full power to legislate concerning the tribal property, and lands so held are still subject to the legislation of Congress enacted in the exercise of the government’s guar *373 dianship over such Indian communities and their affairs. Tiger v. Western Investment Co., supra. U. S. v. Sandoval, 231 U. S. 28. But the ownership of the government or its interest in Indian lands, timber, etc., is, it seems to us, no greater than its right to use for its own purpose, or otherwise than for the benefit of the Indians concerned, any of the net proceeds derived from the sale of Indian lands, timber, etc. It has been consistently held that the government is liable for any such proceeds which may have been appropriated to its own use or diverted to other purposes, and it has also been held that the Indians are the beneficial owners of treaty lands. In United States v. Brindle, 110 U. S. 688, 693 (1884), the court said: “These Indian trust lands were never public lands of the United States, and were never subject to sale at the Lecompton land office. The cessions to the United States were in trust, to survey, manage, and sell the lands and pay the net proceeds to or invest them for the Indians. There was never a time that the United States occupied any other position under the cessions than that of trustees, with power to sell for the benefit of the Indians. In equity, u/nder the operation of the treaties, the Indians continued, u/ntil sales were made, the beneficial owners of all their coimtry ceded in trust. Of this we have no doubtT (Italics ours.) In Iowa Tribe of Indians v. United States, 68 C. Cls. 586, where, as here, the Indian title was a right of use and occupancy, and representations were made to the Indians by the commissioners of the United States in acquiring 219,803 acres of their lands for 38 cents an acre that they had but a limited and qualified interest (p. 594), which is the contention made by government counsel here, the court, at page 609, said:
Without ascribing improper motives to the commissioners, the record at the very outset discloses an obvious and serious misconception of the Indians’ title to their lands, and the making of representations to the Indians, calculated to inspire fear, which had absolutely no basis in law or in fact.
Counsel for defendant also point to a statement in the former opinion of this court in the case at bar, 82 C. Cls. 23, where, in discussing the interest of Indian tribes in reserva *374 tion lands subsequent to the Act of March 3, 1883 (22 Stat. 582, 590), it was indicated that prior to that time the Indians were not the beneficial owners of the reservation lands. In that opinion we held that the taking occurred in 1891, and the statement was dictum. The reasons hereinbefore stated in this opinion demonstrate its inaccuracy.
Most of the prior opinions in cases brought to recover the value of Indian lands appear to have proceeded, in the determination of the value of the property rights taken, on the principle that the value of the sole and absolute right of use and occupancy was the value of the land, without otherwise discussing the nature and extent of the Indian title or defining the beneficial incidents which attach to the primary right of absolute use and occupancy. Thus, in the case of The Ute Indians v. United States, 45 C. Cls. 440, the court, after referring to the provisions of section 3 of the Ute Agreement of June 15,1880 (21 Stat. 199), and quoting the Act of April 24,1820 (3 Stat. 566), which fixed the minimum price of public lands at $1.25 an acre, said, at pp. 462 and 463:
A similar question was involved in an appeal from this court to the Supreme Court in the case of United States v. Blackfeather (155 U. S. 180; 28 C. Cl. 447). In commenting upon the obligation of the United States to expose the lands in question at public sale, Mr. Justice Brown, in delivering the opinion of the Court, said:
“In the absence of any proof of the actual value of these lands at this time, there would seem to be no method of estimation except by taking the price at which public lands were subject to be sold at private sale, namely, $1.25 per acre. Not only is there some presumption that the Government would not sell them for less than they were worth, but the very fact that at that time all public lands were subject to entry at $1.25 per acre would render it impossible to sell them at a greater price unless by reason of their peculiar location, abundant timber, or extraordinary fertility they were exceptionally valuable.” (Id. 191.) [Italics supplied.]
The average price at which the lands within the Ute reservation were sold between the date of the agreement (1880) and June 30, 1908, was $1.68 per acre. Presumably the choicest lands were selected by the purchasers. The forest reservations were set apart at *375 different dates between 1891 and 1905. While it is doubtless true that considerable of the land within these forest reservations is quite Avaluadle, on the other hand, the official reports show, and it is a fact so well known as to come within judicial notice, that considerable portions of them are valueless and can never be sold at any price.
In view, therefore, of the law and the facts as stated, we have found the value of the lands thus set apart in forest reservations to be $1.25 per acre, amounting to $3,835,323.75 [covering 3,199,258 acres].
The title of the government in Indian lands, which has been designated as the “naked fee”, is a sovereign title. The government has no landlord from whom it holds the “fee.”
The interpretation of defendant’s counsel of the Indians’ “right of absolute use and occupancy” is too restricted. “A treaty with Indians must be construed not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.” Jones v. Meehan, 175 U. S. 1, 11. The right of occupancy is the real ownership. It is the full title, or as much title, as, under our conception, any other than the sovereign usually holds. After the Treaty of July 3, 1868, the government had no real ownership of the Shoshone Reservation, but only the right to control and manage the property and affairs of the Shoshone Indians for their betterment and welfare, and a possibility of acquiring an ownership of the reservation lands. As held by the court in California 7 Oregon Land Co. v. Worden, 85 Fed. 94, 96 (1898), after discussing United States v. Cook, supra. “For all purposes, therefore, save only that of private sale, the Indians were in fact the owners of these lands. And this right, title, or interest has never been surrendered by them.” Although Indians are under the protection of the general government, and are, of necessity, kept as a separate, subordinate, and independent people, United States v. Lariviere, 93 U. S. 188, and though dependent political communities, with whom the United States may deal only through treaties or Acts of Congress, Indians are in a dependent condition which cannot be put off without the consent of the United States, Elk v. Wilkins, 112 U. S. 94; nevertheless, it was held by the *376 Supreme Court in The Chippewa Indians of Minnesota v. United States, 301 U. S. 358, 375: “Our decisions, while recognizing that the government has power to control and manage the property and affairs of its Indian wards in good faith for their welfare, show that this power is subject to constitutional limitations and does not enable the government to give the lands of one tribe or band to another, or. to deal with them as its own.” From what has been said, it seems clear that the beneficial incidents attaching to the absolute right of possession, use, and occupancy were more than the mere right to live upon the lands and cultivate them. If the latter were the full extent of the Indians’ interest, few, if any, Indian tribes could secure compensation for the taking of their lands, for in most, if not all, of such cases sufficient territory has been left to supply the Indians with a place to live and with farms as large as the adult Indians of the tribes were capable of cultivating. But we think it is clear that under a proper construction of the treaties this is not the measure of their right to compensation for treaty lands taken from them.
The next question concerns the value of a one-half interest in the lands of plaintiff taken for the Arapahoe Tribe. The contentions of the parties with reference to the value of a one-half interest in plaintiff’s reservation taken for the Northern Arapahoe Indians in 1878 have already been stated. Upon the whole record and in the light of conditions existing in March 1878, when a one-half interest in the reservation was taken, we are of opinion that the value of the property rights of plaintiff in and to one-half of their reservation, taking into consideration the fact that the portion of the reservation on which the Arapahoe Indians was placed, namely, the eastern portion, from which the plaintiff tribe was thereafter excluded, and which has subsequently been allotted in severalty to the Arapahoe Indians, was $1,581,-889.50, or at the rate of $1.35 an acre for 1,171,770 acres, being one-half of the Indian Reservation of 2,343,540 acres. The greater portion of the lands embraced within this reservation was very fertile and unusually well adapted to farming by reason of an adequate supply of water well situated for the use of irrigation purposes. The reservation also *377 embraced a very large area of fine grazing land from which a large amount of income has been derived from grazing leases. The reservation contained more than a billion feet of excellent timber and portions of the reservation were underlaid with bituminous coal. It contained a large but undetermined quantity of oil and gas, and these conditions were known to exist in 1878. The 1926 present value of the oil reserves on the reservation were fixed by the government at $6,000,000.
Net income has been steadily derived from various sources on the reservation, and for the period from 1885 to 1927 net proceeds totaling $1,628,744.56 were derived from the reservation and deposited in the Treasury to the credit of the plaintiff and the Arapahoe tribes of Indians. This amount does not include any portion of the amounts paid for lands ceded. In 1872 plaintiff tribe ceded 700,642 acres of their reservation from which private parties had, without the consent of the government or plaintiff, mined gold to the value of $500,000. The consideration offered by the government’s commissioner appointed to negotiate for the cession, and included in the cession agreement, was $27,500. This government commissioner drove a hard bargain with the Indians, and he so stated in returning the cession agreement to the government. Obviously the consideration paid was inadequate, but, as stated in the previous opinion in this case, the agreement having been made and ratified, and the consideration paid, the matter is not now before the court. In making that agreement no consideration was given to the value of the property rights of the Indians or to the value of the land. The transaction is obviously of no value in the determination of the value of the property rights of plaintiff in one-half of the entire reservation taken in March 1878. Cession agreements of this character, negotiated and brought about in the manner in which the one in 1872 was obtained, are not helpful in arriving at the net value of Indian lands, for in most, if not all, of such agreements negotiated and obtained at an early date the lands were secured for an amount which the Indians could be induced to take rather than for an amount based upon what their property rights were really worth. Iowa Tribe of Indians v. United States, *378 supra, p. 612. This is illustrated by the fact that under the 1872 cession agreement approximately three cents an acre was paid, and twenty years later another cession agreement was obtained to a portion of the reservation not nearly so valuable as that ceded under the 1872 agreement, nor as valuable as the remaining portions of the reservation, at a price of more than one dollar an acre.
The established prices at which the Federal Government sold agricultural, timber, and mineral lands in 1878 ranged from $1.25 an acre for desert land, tillable only under irrigation, to $20 an acre for coal lands. The lands embraced within the Shoshone Reservation, by reason of their peculiar location, abundant supply of water for irrigation purposes, and timber, and their extraordinary fertility, were especially valuable. As found by the Secretary of the Interior in 1878, “No part of the reservation can be considered valueless for all purposes.” The facts concerning the character and location of the lands in question, their productiveness and capabilities, and their yield of profits to the Indians have been set forth in detail in the findings and need not be repeated here.
Prior to the controlling date in this case, a trusted representative of the government in its dealings with Indian tribes, with many years experience, and fully familiar with the reservations set apart for Indian tribes, reported'that the Shoshone Indians “are rich in valuable land”, and further stated, “I have visited many other reservations, but I have found none that excels or even equals the land in Big Wind, Little Wind, and Popo Agie Valleys.” He also described the lands embraced within this reservation as “the finest grazing west of the Missouri.” In arriving at the value on March 19, 1878, of the property rights of plaintiff tribe, which were taken on that date by the government for the Northern Arapahoe Tribe, we have taken into consideration and given due weight to the fact that the eastern portion of the reservation on which the Arapahoe Tribe was placed was the choicest portion and more valuable than the other farming and grazing lands of the reservation, and these lands were subsequently allotted to the Arapahoe Indians. The facts of record clearly support the net value of $1,581,889.50 for a *379 one-half interest in plaintiff’s reservation in 1878, and we have so found. Plaintiff is therefore entitled to recover this amount. In arriving at the net value of $1.35 an acre for 1,171,770 acres constituting a one-half interest in plaintiff’s reservation we have, in addition to considering all factors affecting value, given consideration and due weight to well-known facts, which are also disclosed by this record — first, that large areas of Indian lands, if sold, are not disposed of and have never been sold as a whole, but usually in small or comparatively small tracts; second, that such lands if not sold are, and were in 1878, capable of returning to the Indians large annual net profits over a long period of time; third, that the timber and oil and gas rights, etc., are sold or leased separately from the lands, as such; fourth, that if sold the reasonable and necessary costs of surveying and selling the lands must be deducted from the gross proceeds.
In addition to this value, plaintiff’s damages include an additional amount beyond the value of its property rights when taken by the government, which is necessary to the award of just compensation. The parties agree that such additional amount should be measured by interest at a reasonable rate on the value of the property rights taken in 1878 to the date of payment and from the total amount determined to be due at the date of judgment there should be deducted the total offset to which the government is held entitled. The government claims a total offset under its counterclaim of $2,141,070.75. In accordance with the findings and for the reasons therein stated, we have reduced the total of the defendant’s counterclaim to $1,956,233.68.
Plaintiff contends that the additional amount to be added to the value of the property in 1878 to make just compensation should be measured by interest at the rate of 7 percent per annum, which has been the statutory rate of interest in Wyoming since 1923. The statutory interest in that state was 12 percent prior to 1895 and 8 percent from that date until 1923.
The defendant insists upon the use of an interest rate of 5 percent, which we think, under all the circumstances, is reasonable and the rate that should be used in this case. Cf. United States v. Creek Nation, supra.
*380 As a general rule, treaties, acts of Congress, and agreements have in practically every case in which interest is mentioned, provided for interest on funds held in trust by the government for the benefit of Indians at a rate of 5 percent per annum. There are a number of reasons which support the use of this rate in cases of this character, notwithstanding a higher rate was provided by state statutes and notwithstanding, also, the Act of February 26, 1931, 46 Stat. 1421, U. S. Code, 1934 Edition, Title 40, section 258 (a), provided an interest rate of 6 percent per annum in just compensation cases.
The field for investment by an Indian tribe was and is limited in the absence of an agreement to a deposit of the amount due the Indians in the Treasury of the United States and the payment thereon by the government of interest at the rate of 5 percent. The field for investment by citizens of funds received for property taken, and paid contemporaneously with the taking, is unlimited, and he is in a position and capable of taking full advantage of the local rate of interest. If, therefore, his money is not paid at the time of the taking, but later, the courts add to the value of his property at the time of taking an additional amount measured by interest, usually at 6 percent per annum, and, in some cases, a higher rate which he probably would have earned with his capital to the date of payment. We think a rate of 5 percent is reasonable between the parties here. The additional amount to which plaintiff is entitled to have added to the value of its property rights at the date of taking, computed as above to June 1, 1937, is $4,682,392.92. There is, therefore, due plaintiff on June 1, 1937, the total amount of $6,264,282.42 plus $100,395.49 (Finding 10), totaling $6,364,677.91.
Section 8 of the Act of March 3, 1927, under which this suit was brought, provides that the court shall hear, examine, and adjudicate any claims which the United States may have against plaintiff, that the government may plead as an offset against any amount determined to be due the tribe any payment made by the United States, including gratuities. The total payment, including gratuities made by the United States for the benefit of plaintiff, which we have *381 determined to be a proper offset against tbe Shoshone Indians, is $1,956,233.68. The deduction of this amount from the amount of $6,364,677.91 due plaintiff leaves $4,408,444.23 for which judgment will be entered in favor of plaintiff with interest at 5 percent per annum on $1,581,889.50 from June 1, 1937, until date of payment. It is so ordered.
Williams, Judge; GkeeN, Judge; and Booth, Ghief Justice, concur.
Whaley, Judge, dissents on the ground that the valuation placed on the land taken is excessive.

The legislation referred to was as follows: The general allotment act of February 8, 1887, 24 Stat. 388, which was construed as validating (if there were any doubt) Indian reservations created by Executive order; and the Acts of February 20, 1893, 27 Stat. 469, and March 2, 1895, 28 Stat. 894, providing that the net proceeds from the sale of parts of the White Mountain Apache Indian Reservation, including the proceeds from timber, coal, and mineral lands, shall be deposited in the Treasury for the use and benefit of the Indians occupying the Reservation.