# OREGON DEPARTMENT OF FISH AND WILDLIFE ET AL. *v.* KLAMATH INDIAN TRIBE

No. 83–2148.   Argued February 27, 1985—Decided July 2, 1985

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 775. POWELL, J., took no part in the decision of the case.

*Dave Frohnmayer*, Attorney General of Oregon, argued the cause for petitioners. With him on the briefs were *William F. Gary*, Deputy Attorney General, *James E. Mountain, Jr.*, Solicitor General, and *Michael D. Reynolds* and *Margaret E. Rabin*, Assistant Attorneys General.

*Don B. Miller* argued the cause for respondent. With him on the brief were *Kim Jerome Gottschalk* and *Sande Schmidt*.

JUSTICE STEVENS delivered the opinion of the Court.

In 1901 the Klamath Indian Tribe ceded 621,824 acres of reservation land to the United States. The question pre-

sented in this case is whether the Tribe thereafter retained a special right to hunt and fish on the ceded lands free of state regulation. In answering that question we consider not only the terms of the 1901 Cession Agreement but also the predecessor 1864 Treaty that established the Tribe's original reservation and certain other events in the history of the Tribe.

## I

In the early 19th century, the Klamath and Modoc Tribes and the Yahooskin Band of Snake Indians claimed aboriginal title to approximately 22 million acres of land extending east from the Cascade Mountains in southern Oregon. In 1864 these Tribes (now collectively known as the Klamath Indian Tribe) entered into a Treaty with the United States, ceding "all their right, title and claim to all the country claimed by them" and providing that a described tract of approximately 1.9 million acres "within the country ceded" would be set apart for them, to be "held and regarded as an Indian reservation." 16 Stat. 707, 708.[1] The 1864 Treaty also provided that the Tribes would have "secured" to them "the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits." Ibid.[2] No right to hunt or fish outside the reservation was preserved.

The boundaries of the reservation were first surveyed by the United States in 1871. Members of the Tribe immediately complained that the surveyor had erroneously excluded

---

[1] Treaty of Oct. 14, 1864 (ratified by the Senate on July 2, 1866, and proclaimed by President Grant on February 17, 1870).

[2] Relying on our decision in Menominee Tribe v. United States, 391 U. S. 404 (1968), the Court of Appeals for the Ninth Circuit has held that the language of the 1864 Treaty also served to reserve for the Tribe a right to hunt and trap game within the reservation, as well as the rights to fish and gather. Kimball v. Callahan, 493 F. 2d 564, 566, cert. denied, 419 U. S. 1019 (1974). See also California & Oregon Land Co. v. Worden, 85 F. 94, 97 (CC Ore. 1898) (Klamath's 1864 Treaty "operates as a reservation of the rights held by the Indians at the time the treaty was entered into").

large areas of land from the reservation as described in the 1864 Treaty. These complaints continued after the Government resurveyed the boundaries, and slightly enlarged them, in 1888. In response to these complaints, in 1896 Congress authorized a Boundary Commission to determine the amount and value of the land that had been incorrectly excluded from the reservation.[3]

In October 1896, the three-member Boundary Commission visited the reservation, traveled its disputed boundaries with a Klamath Indian guide, and interviewed a number of Klamath Indians who had participated in the negotiation of the 1864 Treaty. See Klamath Boundary Commission Report (Dec. 18, 1896), reprinted in S. Doc. No. 93, 54th Cong., 2d Sess., 5–19 (1897). These Indians specifically recalled that the parties to the 1864 Treaty had intended to include the Sycan and Sprague River Valleys within the eastern portion of the reservation because those valleys had been an important source of fish and game for members of the Tribe.[4]

---

[3] Act of June 10, 1896, ch. 398, 29 Stat. 321, 342. The Act provided: "That the President of the United States is hereby authorized to appoint a commission . . . whose duty it shall be to visit and thoroughly investigate and determine as to the correct location of the boundary lines of the Klamath Indian Reservation. . . . [S]aid commission shall ascertain and determine, as nearly as practicable, the number of acres, if any, of the land, the character thereof, and also the value thereof, in a state of nature, that have been excluded from said treaty reservation by the erroneous survey . . . ."

[4] Thus, Henry Blow, a former Klamath Tribe chief who had signed the 1864 Treaty, testified as follows:

"Q. Was anything said by Mr. Huntington [the United States' treaty negotiator] or the Indians about Sycan or Sprague River Valley?

"A. Yes; the Indians said they wanted to keep these two valleys for the camas roots and pastures, the fish, etc., as well as the game in the mountains." S. Doc. No. 93, 54th Cong., 2d Sess., 14 (1897).

Mo Ghen Kas Kit, a chief of the Klamath Tribe at the time of the 1864 Treaty negotiations and a Treaty signatory, testified:

"At the time of the treaty of Council Grove we, the Indians, told Mr. Huntington, before and after describing these points, that we particularly wanted all the Sycan Valley down to Ish tish e wax [place of small fish],

Based on its review of the 1864 negotiations and the geo-graphical description provided in the Treaty itself, the Boundary Commission concluded that over 617,000 acres of land had been erroneously excluded from the reservation in previous Government surveys. *Id.*, at 11.

The Boundary Commission determined that the excluded land had an average value of 83.36 cents per acre. This fig-ure took into account "the good timber land and the meadows of the Sycan and Sprague River valleys" as well as the "rocky and sterile mountain ranges, producing very ordinary timber and little grass."[5] The Commission's valuation was based on the use of the land for stock grazing and as a source of

including the Sprague River Valley, because we needed it, especially for the camas and other roots in the valley and the game and the fishing . . . .

.          .          .          .          .

"The Indians particularly told Mr. Huntington of this great need of these two valleys for this purpose, and they were dependent upon them princi-pally for their living. All the headmen and leaders among the Indians saying this—and Mr. Huntington said 'I will,'—you shall have them in the treaty." *Id.*, at 15–16.

[5] The Boundary Commission reported:

"The character of the excluded areas varies greatly. There are some limited tracts of good meadow and grazing land, but the major portion of the area is of inferior quality. With the exception of the meadows of the Sycan and Sprague River sections, which are the principal bone of conten-tion, the greater part of the excluded land consists of rocky and sterile mountain ranges, producing very ordinary timber and little grass.

"The territory in the vicinage of Mounts Scott and Cowhorn on the northwest and north is especially of little or no value.

"Being of volcanic formation, the land consists of substrata of basalt and pumice stone lightly covered with volcanic ashes and decomposed pumice, offering scanty sustenance to vegetation.

"The extensive areas embraced in the eastern slopes and spurs of Yamsay Mountains and the western of Winter Ridge are likewise of little worth owing to their rugged and rocky formation.

"Giving these inferior tracts, the good timber land and the meadows of the Sycan and Sprague River valleys their proportionate valuation, we determine the value of the excluded land to be $533,270, or 617,490 acres at 86.36 cents per acre." *Id.*, at 11.

timber. Its report did not discuss hunting or fishing on the excluded lands, nor did it advert to any valuation for the right to conduct such activities on the land.[6]

Upon receiving the Boundary Commission's report, Congress appropriated funds in 1898 for a precise "resurvey of the exterior boundaries of the Klamath Reservation," and authorized the Secretary of the Interior "to negotiate through an Indian inspector with said Klamath Indians for the relinquishment of all their right and interest in and to" the excluded lands. Act of July 1, 1898, ch. 545, 30 Stat. 571, 592.

The course of negotiations with the Tribe extended over the next two years. The Tribe was assisted by counsel and actively asserted its interests when those interests diverged from the proposals of the United States.[7] Yet the historical

---

[6] Citing the Boundary Commission's report, the parties to this litigation stipulated:

"The Boundary Commission did not take the value of the Tribe's hunting, fishing and trapping rights into account when arriving at its valuation of the land." App. 12.

[7] Negotiation of the final agreement required the efforts of two different negotiators for the United States, first Inspector William J. McConnell and then Inspector James McLaughlin. Throughout the negotiations, the Tribe's central concerns were that it receive some immediate cash payment as a portion of the purchase price, that the remainder be available for use at the Tribe's discretion at least to some degree, and that specific expenditures for irrigation of reservation lands be charged only to Tribe members who would benefit directly from the irrigation. See H. R. Doc. No. 156, 56th Cong., 2d Sess., 10–12 (1900) (letter from Wm. J. McConnell to Secretary of the Interior (Jan. 2, 1899)); id., at 28–30 (letter from J. McLaughlin to Secretary of the Interior (Oct. 29, 1900)); H. R. Doc. No. 79, 57th Cong., 1st Sess., 5 (1901) (letter from J. McLaughlin to Secretary of the Interior (June 19, 1901)). Inspector McConnell apparently lacked authority to agree to some of these terms and, after the Tribe *rejected* McConnell's initial proposals, it proposed a general agreement depositing the full sum recommended by the Boundary Commission with the United States Treasury in the Tribe's name. H. R. Doc. No. 156, 56th Cong., 2d Sess., 11–12 (1900). "As this was their ultimatum," McConnell reported, "I concluded the agreement." *Id.*, at 12.

Despite his negotiation of this agreement, however, Inspector McConnell also reported that, in his opinion, the excluded land was for the

record provided by a number of congressional documents contains no reference to continuation of any special hunting or fishing rights for members of the Tribe after payment for the excluded lands. No objection by the Tribe to resolving the problem by selling the excluded lands to the Government appears anywhere in the record.[8]  Although one Government

most part "practically worthless," and that he believed Congress should restore the unentered excluded acreage to the Tribe rather than purchase it. *Id.*, at 10. If Congress nevertheless chose to purchase all the excluded acreage, McConnell recommended, "the sum to be paid [to the Tribe] should not exceed $250,000," as opposed to the $533,270 that the Boundary Commission had suggested. *Ibid.*

Shortly after McConnell submitted this report, two attorneys for the Tribe wrote to the Commissioner of Indian Affairs criticizing McConnell's views as gratuitous "individual opinion." The Tribe's attorneys requested that "further investigation" be made, "so that full and complete information on this question may be presented to Congress." *Id.*, at 18–19 (letter from J. McCammon and R. Belt to the Hon. W. Jones (Apr. 10, 1899)). In light of the Tribe's objections, and because the United States also was not satisfied with McConnell's agreement in light of his negative report, *id.*, at 21 (letter from A. Tonner to Secretary of the Interior (May 15, 1899)), the second inspector, James McLaughlin, was dispatched to evaluate the excluded lands and negotiate a new agreement. *Id.*, at 22.

[8] The excluded lands posed a problem to the Tribe as well as to the United States because after the erroneous 1871 survey some of the excluded lands had been entered upon and settled by non-Indians. See S. Exec. Doc. No. 129, 53d Cong., 2d Sess., 4 (1894) (extract from annual report of U. S. Indian Agent Joseph Emery for 1887) (noting competing claims of Klamath Indians and "white settlers and cattlemen in the vicinity"); Attachment to S. Exec. Doc. No. 129 (map indicating existence of 34 "townships" outside 1871 reservation boundaries but within the "approximate limits claimed by Indians"). See also T. Stern, The Klamath Tribe 87 (1965). In 1899, Inspector McConnell reported that 62,361 acres of the excluded lands had been "entered" by non-Indians, including 7,080 acres allotted to "proposed settlers," "leaving a balance of 555,129 acres . . . yet unoccupied." H. R. Doc. No. 156, 56th Cong., 2d Sess., 10 (1900) (letter from Wm. J. McConnell to Secretary of the Interior (Jan. 2, 1899)).

Although the Boundary Commission and Congress apparently assumed that the United States would pay the Tribe for the excluded land, rather than restore it to the reservation, the United States' first negotiator, Inspector McConnell, suggested that the unentered excluded acreage should be restored to the Tribe with payment being made only for acres that had

inspector felt that the price recommended by the Boundary Commission was too high, see n. 7, *supra,* the Commission's recommendation ultimately was accepted.[9] The final Cession Agreement was signed by 191 adult male members of the Tribe on June 17, 1901.[10]

In the 1901 Agreement, the United States agreed to pay the Tribe $537,007.20 for 621,824 acres of reservation land. In return, the Tribe agreed in Article I to "cede, surrender, grant, and convey to the United States all their claim, right, title and interest in and to" that land. The reservation was thereby diminished to approximately two-thirds of its original size as described in the 1864 Treaty.[11] The 1901 Agree-

---

already been entered upon. *Ibid.* As already noted, n. 7, *supra,* the attorneys for the Tribe objected to McConnell's report. Although the Department of the Interior considered McConnell's suggestions, it ultimately decided to recommend to Congress that all the excluded lands be purchased.

[9] The second inspector, James McLaughlin, reported that

"whilst it is true that there are a great many acres of valueless land in the said tract, yet there are many acres of arable land which already possess considerable value, and an immense amount of pine timber that must become very valuable in the near future; and, when taking into consideration the twenty-nine years that the Klamath Indians have been deprived of these lands, together with the value of the valleys, meadows, and heavily timbered portions, I most heartily indorse the price . . . ." H. R. Doc. No. 156, at 28.

[10] The substantive terms of the agreement had been negotiated by McLaughlin with the Tribe's negotiating committee over a 3-day period in October 1900. *Id.,* at 29. That agreement, however, mistakenly referred to the 1871 survey of the reservation rather than the 1888 survey. To correct this error, McLaughlin returned to the reservation in June 1901 to obtain the Tribe's assent to an agreement identical to the 1900 agreement but for substitution of the phrase "approved in 1888 by" for "made in 1871 under the authority of" in Article I. H. R. Doc. No. 79, 57th Cong., 1st Sess., 5 (1901) (letter from J. McLaughlin to the Secretary of the Interior (June 19, 1901)).

[11] The Senate Report recommending approval of the 1901 Agreement expressly referred to the "diminished reservation" of the Tribe. S. Rep. No. 198, 59th Cong., 1st Sess., 13 (1906).

ment also provided in Article IV that "nothing in this agreement shall be construed to deprive [the Tribe] of any benefits to which they are entitled under existing treaties not inconsistent with the provisions of this agreement."

The 1901 Agreement was ratified by Congress in 1906. Act of June 21, 1906, ch. 3504, 34 Stat. 325, 367. Between 1901 and 1906, virtually all of the ceded land was closed to settlement entry and placed in national forests or parks, App. 14, a status much of the land retains to this day. The parties have stipulated that members of the Tribe continued to hunt and fish on the ceded lands, from the time of the cession to the commencement of this litigation in 1982. *Ibid.* During that period, there is no record of any assertion by the State of Oregon, or any denial by the Tribe, of state regulatory jurisdiction over Indian hunting or fishing on the ceded lands. *Id.*, at 15. It is also stipulated that hunting, fishing, trapping, and gathering were "crucial to the survival" of the Klamath Indians in 1864, 1901, and 1906, and that these activities continue to "play a highly significant role" in the lives of Klamath Indians. *Id.*, at 19.

## II

In 1954, Congress terminated federal supervision over the Klamath Tribe and its property, including the Klamath Reservation. Pub. L. 587, 68 Stat. 718–723, as amended, 25 U. S. C. §§ 564–564x. The Termination Act required members of the Tribe to elect either to withdraw from the Tribe and receive the monetary value of their interest in tribal property, or to remain in the Tribe and participate in a nongovernmental tribal management plan. § 564d(a)(2). The Termination Act also authorized the sale of that portion of the reservation necessary to provide funds for the compensation of withdrawing members, and the transfer of the unsold portion to a private trustee. § 564e(a).[12] The Termination

---

[12] Of the 2,133 persons listed on the final tribal roll of 1954, 1,660 elected to withdraw from the Tribe and receive monetary compensation. The

Act further specified that its provisions would not "abrogate any fishing rights or privileges of the tribe or the members thereof enjoyed under Federal treaty." § 564m(b).

In 1969, the Indian Claims Commission awarded the Tribe $4,162,992.80 as additional compensation for the lands ceded by the 1901 Agreement. *Klamath and Modoc Tribes* v. *United States,* 20 Ind. Cl. Comm'n 522. As had been the case in 1896 and in 1901, the amount of the Commission's award was based on the estimated value of the land for stock grazing and timber harvesting, which the parties had agreed constituted the "highest and best uses" for the land. *Id.,* at 525. The Claims Commission's opinion did not specify a value for, or mention, hunting or fishing rights.

III

In 1982 the Tribe filed this action against the Oregon Department of Fish and Wildlife and various state officials, seeking an injunction against interference with tribal members' hunting and fishing activities on the lands ceded in 1901. The State conceded that it had no authority to interfere with tribal hunting or fishing on lands sold or transferred pursuant to the 1954 Termination Act, but it asserted the right to enforce state regulations against the Tribe on the lands that had been ceded in 1901.

The essential facts were stipulated. The District Court entered summary judgment in favor of the Tribe, declaring that the 1901 Agreement "did not abrogate" the Tribe's 1864 "treaty rights . . . to hunt, fish, trap and gather, free from regulation by the . . . State of Oregon" on the ceded lands.[13]

_____

remaining 473 tribe members retained a participatory interest in the management of the remainder of the reservation. *Kimball* v. *Callahan,* 493 F. 2d, at 567. At least as of 1979, the Klamath Tribe continued to maintain a tribal constitution, a tribal government, and a tribal Game Commission. *Kimball* v. *Callahan,* 590 F. 2d 768, 776, and n. 14 (CA9), cert. denied, 444 U. S. 826 (1979).

[13] App. 23. The Tribe's complaint had alleged that the "ceded lands" included 87,000 acres granted, "without the knowledge or consent of the

The District Court relied on the language in Article IV of the 1901 Agreement preserving any benefits to which the Tribe was "entitled under existing treaties not inconsistent with the provisions of this agreement," and on the Government's failure to compensate the Tribe expressly for the loss of hunting and fishing rights either in 1901 or 1969.

The Court of Appeals affirmed. 729 F. 2d 609 (1984). It held that the 1864 Treaty had reserved to the Tribe rights to hunt and fish that were not appurtenant to the land itself. Accordingly, when the erroneously excluded lands were ceded to the United States in 1901, that cession did not necessarily include the hunting and fishing rights. Construing the 1901 Agreement in the Indians' favor, the Court of Appeals concluded that the Tribe had retained all rights consistent with the cession not expressly conveyed. The court then ruled that continued hunting and fishing by the Indians on the ceded lands was not necessarily inconsistent with the provisions of the 1901 Agreement. The omission of any reference to hunting or fishing rights, and the failure to compensate the Tribe expressly for such rights, supported the conclusion that Congress had not intended to abrogate them, and

---

plaintiff and without payment of compensation," by the Secretary of the Interior to the California & Oregon Land Company pursuant to an exchange authorized by Congress in 1906. *Id.*, at 5–6. The controversy regarding title to and compensation for these exchanged acres has come before this Court on more than one occasion. See *United States* v. *Klamath and Moadoc Tribes*, 304 U. S. 119 (1938); *Klamath and Moadoc Tribes* v. *United States*, 296 U. S. 244 (1935); *United States* v. *California & Oregon Land Co.*, 192 U. S. 355 (1904); *United States* v. *California & Oregon Land Co.*, 148 U. S. 31 (1893); *United States* v. *Dalles Military Road Co.*, 140 U. S. 599 (1891). See generally O'Callaghan, Klamath Indians and the Oregon Wagon Road Grant, 1864–1938, 53 Oregon Historical Quarterly 23 (1952). Although the District Court's judgment encompassed the right to fish and hunt on these exchanged acres, App. 23, the Court of Appeals did not explicitly address the merits of the Tribe's allegations relating to those lands, and the parties have not mentioned the issue here. We express no opinion on any separate questions related to those lands.

the State had not otherwise sustained its burden of demonstrating a clear congressional intent to extinguish these tribal treaty rights. *Id.*, at 612–613.

Because the Court of Appeals' decision appeared to conflict in principle with the decision of the Eighth Circuit in *Red Lake Band of Chippewa Indians* v. *Minnesota,* 614 F. 2d 1161 *(per curiam),* cert. denied, 449 U. S. 905 (1980),[14] we granted certiorari, 469 U. S. 879 (1984). We now reverse.

## IV

At issue in this case is an asserted right of tribal members to hunt and fish outside the reservation boundaries established in 1901, free of state regulation. The Tribe argues that this special right continued on the lands that were ceded in the 1901 Agreement, even though the reservation boundaries were diminished and the exclusivity of the 1864 Treaty rights necessarily expired on the ceded lands. The Tribe agrees that ceded lands now privately owned may be closed to tribal hunting and fishing, and that the Federal Government validly may regulate Indian activity on the ceded lands now held as national parks or forests. See 729 F. 2d, at 611; Brief for Respondent 12, 17. It is also clear that non-Indians may hunt and fish on at least some of the ceded lands and that members of the Tribe are entitled to the same hunting and fishing privileges as all other residents of Oregon.[15] Our in-

---

[14] In *Red Lake Band,* a band of Chippewa Indians had ceded "all our right, title, and interest in and to" two parcels of land in agreements ratified by Congress in 1889 and 1904. 614 F. 2d, at 1162. The Court of Appeals for the Eighth Circuit ruled that the Band had thereby given up its tribal "rights to hunt, fish, trap and gather wild rice free of the state's regulation of such activities," despite the Band's claim that diminishment of the reservation boundaries in the 1889 and 1904 Acts did not abrogate such rights absent explicit reference. *Ibid.*

[15] In this sense, the off-reservation rights claimed by the Tribe here are somewhat comparable to the off-reservation right "of taking fish at all usual and accustomed places, in common with citizens of the Territory" explicitly reserved in the Treaty construed in *Puyallup Tribe* v. *Depart-*

quiry, therefore, is whether a special right, nonexclusive but free of state regulation, was intended to survive in the face of the language of the 1901 Agreement ceding "all . . . right . . . in and to" the ceded lands.[16]

The Court of Appeals' holding was predicated on its understanding that the hunting and fishing rights reserved to the Tribe by the 1864 Treaty were not appurtenant to the land within the reservation boundaries. 729 F. 2d, at 612. We agree with the Court of Appeals that Indians may enjoy special hunting and fishing rights that are independent of any

---

*ment of Game of Washington*, 391 U. S. 392 (1968), and *United States* v. *Winans*, 198 U. S. 371 (1905). See n. 16, *infra*.

[16] We have not previously found such absolute freedom from state regulation on nonreservation lands, even in the face of Indian cession agreements that expressly reserved a right to hunt or fish on ceded non-reservation lands. See, *e. g., Puyallup Tribe* v. *Department of Game of Washington*, 391 U. S., at 398 (State may regulate "manner" of Indian fishing although treaty reserved right to take fish "at all usual and accustomed places" including places outside the reservation); *Kennedy* v. *Becker*, 241 U. S. 556, 563–564 (1916) (Indian fishing subject to "appropriate regulation" despite explicit reservation of "the privilege of fishing and hunting" in cession agreement); *United States* v. *Winans*, 198 U. S., at 384 (although reserved right to take fish at "all usual and accustomed places" outside the reservation implies an easement over private lands, it does not otherwise "restrain the state unreasonably . . . in the regulation of the right"); see also *Washington* v. *Washington Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 682–684 (1979) (reserved Indian right to "take fish" off the reservation is not an "untrammeled right" and is subject to "nondiscriminatory" conservation regulation by the State); Hobbs, Indian Hunting and Fishing Rights, 32 Geo. Wash. L. Rev. 504, 525, 532 (1964).

Indeed, as we have unanimously noted:

"Our cases have recognized that tribal sovereignty contains 'a significant geographical component.' Thus the off-reservation activities of Indians are generally subject to the prescriptions of a 'nondiscriminatory state law' in the absence of 'express federal law to the contrary.'" *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324, 335, n. 18 (1983) (citations omitted).

See also *Kake Village* v. *Egan*, 369 U. S. 60, 75 (1962) ("State authority over Indians is . . . more extensive over activities . . . not on any reservation").

ownership of land,[17] and that, as demonstrated in 25 U. S. C. § 564m(b), the 1954 Termination Act for the Klamath Tribe, such rights may survive the termination of an Indian reservation.[18] Moreover, the Court of Appeals was entirely correct in its view that doubts concerning the meaning of a treaty with an Indian tribe should be resolved in favor of the tribe. See *Washington* v. *Washington Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 675–676 (1979); *Carpenter* v. *Shaw*, 280 U. S. 363, 367 (1930). Nevertheless, we cannot agree with the court's interpretation of the 1901 Cession Agreement or with its reading of the 1864 Treaty.

## V

Before the 1864 Treaty was executed, the Tribe claimed aboriginal title to about 22 million acres of land. The Treaty language that ceded that entire tract—except for the 1.9 million acres set apart for the Klamath Reservation—stated only that the Tribe ceded "all their right, title, and claim" to the described area. Yet that general conveyance unquestionably carried with it whatever special hunting and fishing rights the Indians had previously possessed in over 20 million acres outside the reservation. Presumptively, the similar language used in the 1901 Cession Agreement should have the same effect.

More importantly, the language of the 1864 Treaty plainly describes rights intended to be exercised within the limits of the reservation. This point can be best understood by consideration of the entire portion of the Treaty in which the right of taking fish is described. The relevant language of the 1864 Treaty is found in Article I:

---

[17] *E. g.*, *Antoine* v. *Washington*, 420 U. S. 194 (1975), and cases cited in n. 16, *supra*.

[18] See *Menominee Tribe* v. *United States*, 391 U. S. 404 (1968); *Kimball* v. *Callahan*, 590 F. 2d, at 772 (Klamath Indians retain right to hunt and fish on lands within "the former reservation at the time of the [1954 Termination] Act's enactment").

"That the following described tract, within the country ceded by this treaty, shall, until otherwise directed by the President of the United States, be set apart as a residence for said Indians, [and] held and regarded as an Indian reservation . . . . And the tribes aforesaid agree and bind themselves that, immediately after the ratification of this treaty, they will remove to said reservation and remain thereon, unless temporary leave of absence be granted to them by the superintendent or agent having charge of the tribes.

"It is further stipulated and agreed that no white person shall be permitted to locate or remain upon the reservation, except the Indian superintendent and agent, employés of the Indian department, and officers of the army of the United States . . . [and] that in case persons other than those specified are found upon the reservation, they shall be immediately expelled therefrom; and the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits, is hereby secured to the Indians aforesaid . . . ." 16 Stat. 708.

The fishing right thus reserved is described as a right to take from the streams and lakes "included in said reservation," and the gathering right is for edible roots, seeds, and berries "within its limits." This limiting language surely indicates that the fishing and gathering rights pertained to the area that was reserved for the Indians and from which non-Indians were excluded. Although hunting is not expressly mentioned in the Treaty, it is clear that any exclusive right to hunt was also confined to the reservation. The fact that the rights were characterized as "exclusive" forecloses the possibility that they were intended to have existence outside of the reservation; no exclusivity would be possible on lands open to non-Indians. Moreover, in view of the fact that Article I restricted members of the Tribe to the reservation, to "remain thereon, unless temporary leave of absence

be granted," it is manifest that the rights secured to the Indians by that same Article did not exist independently of the reservation itself.

The language of the 1901 Agreement must be read with these terms of the 1864 Treaty in mind. In 1954 when Congress terminated the Klamath Reservation, it enacted an express provision continuing the Indians' right to fish on the former reservation land. 25 U. S. C. § 564m(b); see *Kimball* v. *Callahan*, 590 F. 2d 768 (CA9), cert. denied, 444 U. S. 826 (1979). The 1901 Agreement contained no such express provision concerning the right to hunt and fish on the lands ceded by the Tribe. Instead, the 1901 Agreement contained a broad and unequivocal conveyance of the Tribe's title to the land and a surrender of "*all* their claim, *right*, title, and interest *in and to*" that portion of the reservation. 34 Stat. 367 (emphasis added).[19] The 1901 Agreement thus was both a divestiture of the Tribe's ownership of the ceded lands and a diminution of the boundaries of the reservation within which the Tribe exercised its sovereignty. In the absence of any language reserving any specific rights in the ceded lands, the normal construction of the words used in the 1901 Agreement unquestionably would encompass any special right to use the ceded lands for hunting and fishing.

This conclusion is unequivocally confirmed by the fact that the rights secured by the 1864 Treaty were "exclusive." Since the 1901 Cession Agreement concededly diminished the reservation boundaries, any tribal right to hunt and fish on the ceded, off-reservation lands can no longer be "exclusive" as specified in the 1864 Treaty. Indeed, even if the Tribe had expressly reserved a "privilege of fishing and hunting" on the ceded lands, our precedents demonstrate that such an express reservation would not suffice to defeat the State's

---

[19] We previously have described such language as "express language of cession." *Solem* v. *Bartlett*, 465 U. S. 463, 469, n. 10 (1984).

power to reasonably and evenhandedly regulate such activity. See n. 16, *supra*. In light of these precedents, the absence of any express reservation of rights, as found in other 19th-century agreements, only serves to strengthen the conclusion that no special off-reservation rights were comprehended by the parties to the 1901 Agreement.[20]

As both the District Court and the Court of Appeals noted, Article IV of the 1901 Agreement preserved all of the Klamath Indians' "benefits to which they are entitled under existing treaties, not inconsistent with the provisions of this agreement." Article IV thus made it clear that none of the benefits that the Tribe had preserved within its reservation in the 1864 Treaty would be lost. But because the right to hunt and fish reserved in the 1864 Treaty was an exclusive right to be exercised within the reservation, that right could

---

[20] In *United States* v. *Winans*, 198 U. S. 371 (1905), Yakima Indians sought to exercise their treaty right to take fish "at all usual and accustomed places," including places outside the reservation on land previously owned by and open to the Yakima but later ceded. Private owners of land fronting on some of those places subsequently asserted a right to bar Indians from their property. In holding that the Indians retained a right to cross private property to reach their usual fishing places, the Court stated: "New conditions came into existence, to which [the Tribe's fishing] rights had to be accommodated. Only a limitation of them, however, was necessary and intended, not a taking away." *Id.*, at 381. The Tribe relies on *Winans* for the proposition that its right to hunt and fish on the ceded lands similarly should be considered limited by necessity but not extinguished. *Winans*, however, expressly noted that the State possessed the power to reasonably regulate the Yakima's off-reservation fishing. *Id.*, at 384; see n. 16, *supra*. Moreover, the cession agreement in *Winans* expressly reserved the right to fish on nonreservation lands. The only question presented was whether that clearly stated right was to be frustrated because of subsequent transfers of ceded lands to private parties. The Court found, as a matter of intent, that the 1859 Yakima Treaty could not be so interpreted. 198 U. S., at 381. The present case, however, involves the necessarily precedent question whether any off-reservation rights were intended to be preserved at all. *Winans* sheds no light on how that question should be resolved.

not consistently survive off the reservation under the clear provisions of cession and diminution contained in Article I. Moreover, a glaring inconsistency in the overall Treaty structure would have been present if the Tribe simultaneously could have exercised an independent right to hunt and fish on the ceded lands outside the boundaries of the diminished reservation while remaining bound to honor its 1864 Treaty commitment to stay within the reservation absent permission. Article IV cannot fairly be construed as an implicit preservation of benefits previously linked to the reservation when those benefits could be enjoyed thereafter only outside the reservation boundaries.[21]

In sum, the language of the 1864 Treaty indicates that the Tribe's rights to hunt and fish were restricted to the reservation. The broad language used in the 1901 Agreement, virtually identical to that used to extinguish off-reservation rights in the 1864 Treaty, accomplished a diminution of the reservation boundaries, and no language in the 1901 Agreement evidences any intent to preserve special off-reservation hunting or fishing rights for the Tribe. Indeed, in light of the 1901 diminution, a silent preservation of off-reservation rights would have been inconsistent with the broad language of cession as well as with the Tribe's 1864 Treaty agreement to remain within the reservation.

## VI

The Tribe acknowledges that the 1901 Agreement is silent with regard to hunting and fishing rights, but argues that that silence itself, viewed in historical context, demonstrates

---

[21] After the 1864 Treaty was proclaimed, a written pass system apparently was implemented to comply with the "temporary leave of absence" provision of Article I. See T. Stern, The Klamath Tribe 91, 125–126 (1965). Although the record establishes that members of the Tribe continued to hunt and fish outside of the boundaries of the diminished reservation after 1901, App. 14, there is no indication of any concern regarding their legal right to do so until commencement of this litigation.

an intent to preserve tribal hunting and fishing rights in the ceded land. The Tribe asserts that Congress' "singular" purpose in negotiating and ratifying the 1901 Agreement was "to benefit the Indians by honoring the United States' Treaty obligations," and that an intent to extinguish hunting and fishing rights would be inconsistent with this purpose. Brief for Respondent 28–30, and n. 13. We disagree for two reasons.

First, an end to the Tribe's special hunting and fishing rights on lands ceded to the Government, if accomplished with the understanding and assent of the Tribe in return for compensation, is not at all inconsistent with an intent to honor the 1864 Treaty. Having acknowledged an intent to remedy its breach of the 1864 Treaty, the United States might have opted to restore the correct boundaries of the reservation and compensate the Indians for any loss occasioned by the erroneous surveys, or, instead, to acquire the erroneously excluded land for a price intended to represent fair compensation. Both options are consistent with an intent to honor the Treaty obligations. Choice of the purchase and compensation option is also consistent with an intent, on both sides, to end any special privileges attaching to the excluded land. Moreover, since the boundary restoration option would have unquestionably preserved such rights for the Tribe, the rejection of that option is also consistent with an intent not to preserve those rights.

Second, Congress in 1901 was motivated by additional goals. By 1896, non-Indian settlers had moved onto the disputed reservation lands, the State of Oregon had completed a military road across the reservation, and conflicts between members of the Tribe and non-Indians perceived as interlopers were sufficient to require congressional attention. See S. Doc. No. 129, 53d Cong., 2d Sess. (1894); n. 8, *supra*. Negotiations with the Tribe were authorized in order to settle these conflicts as well as to honor fairly the terms of the

1864 Treaty. These goals again suggest two equally consist-
ent options: restoration of the correct reservation boundaries
and exclusion of non-Indians as the 1864 Treaty required, or
purchase of the excluded, entered-upon lands. Rather than
restore the excluded lands to the Tribe—an option that would
have left intact the Tribe's exclusive right to hunt and fish on
those lands—Congress chose to remove the excluded lands
from the reservation, leaving them open for non-Indian use,[22]
and to compensate the Indians for the taking.

The historical record of the lengthy negotiations between
the Tribe and the United States provides no reason to reject
the presumption that the 1901 Agreement fairly describes
the entire understanding between the parties. The Tribe
was represented by counsel, the tribal negotiating committee
members spoke and understood English, and the Tribe se-
cured a number of alterations to the United States' original
proposals. H. R. Doc. No. 156, 56th Cong., 2d Sess., 29–30
(1900). Although members of the Tribe had stressed the im-
portance of hunting and fishing on the excluded lands in order
to establish their claim to title with the Boundary Commis-
sion in 1896, there is no record of even a reference to a right
to continue those activities on those lands in the course of
negotiating for the cession of the land and all rights "in and

---

[22] The Tribe suggests that, because Congress closed virtually all the ceded
lands to entry by 1906, this case is to be distinguished from others in which a
congressional purpose to open Indian lands to non-Indian settlement might
"reveal a clear Congressional intent" to terminate off-reservation Indian
rights. Brief for Respondent 33, n. 15; see *Solem* v. *Bartlett*, 465 U. S.,
at 471. Of course, in our diminishment cases like *Solem*, the question
has been whether diminishment has occurred—limitation of tribal rights
outside a diminished reservation has been presumed. See, *e. g.*, *id.*, at
467; *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584, 630–632 (1977) (MAR-
SHALL, J., dissenting); *Mattz* v. *Arnett*, 412 U. S. 481, 483, n. 1 (1973). In
this case diminution is acknowledged, and the Tribe poses the entirely dif-
ferent question whether special rights nevertheless survived. Moreover,
virtually all of the congressional withdrawal of the ceded lands involved in
this case occurred *after* the 1901 Agreement was negotiated and signed.
App. 13–14.

to" it. The failure to mention these rights in the face of this language, as well as the specific terms of the 1864 Treaty that would appear to render their continued exercise inconsistent with diminution, strongly supports the conclusion that there existed no contemporary intention specially to preserve those rights.[23]

The Tribe finally contends that the absence of any payment expressly in compensation for hunting and fishing rights on the ceded lands demonstrates that the parties did not intend to extinguish such rights in 1901. This contention again rests entirely on the assumption that the 1864 Treaty created hunting and fishing rights that were separate from and not appurtenant to the reservation. As explained above, that assumption is incorrect. Moreover, the fact that there was no separate valuation of the right to hunt and fish on the ceded lands is consistent with the view that the parties did not understand any such separate right to exist, and that the value of fish, game, and vegetation on the ceded lands was subsumed within the estimated value of the land in general. Indeed, had the parties actually intended to preserve independent hunting and fishing rights for the Tribe on the ceded lands, the Boundary Commission presumably would have computed the value of such rights and explicitly subtracted that amount from the price to be paid for land so encumbered.

---

[23] The Tribe ultimately argues that, because the 1901 Agreement "did not say one word about ceding" hunting and fishing rights specifically, we must presume that "the Tribe would reasonably have believed that failure to mention these express Treaty rights could only result in their continuation." Brief for Respondent 37. This belief, if it actually existed, was largely correct, of course: the exclusive rights preserved in the 1864 Treaty were indeed continued *within the reservation* after the 1901 Agreement.

Additionally, the 1901 Agreement cannot really be characterized as "silent" with regard to the preservation of off-reservation rights—it expressly stated that the Tribe ceded all its right in and to the land. Viewed in the entirety of its particular historical context, silence concerning specific rights in the 1901 Agreement is consistent only with an intent to end any special rights of the Tribe outside the reservation. Cf. *Ward* v. *Race Horse*, 163 U. S. 504 (1896).

Moreover, the Tribe has since been afforded an opportunity to recover additional compensation for the ceded lands, in light of the "unconscionable" amount paid in 1906. 20 Ind. Cl. Comm'n, at 530. Yet in that proceeding, which resulted in an award to the Tribe of over $4 million, *id.*, at 543, the Tribe apparently agreed that the "highest and best uses" for the ceded lands were commercial lumbering and livestock grazing, again without mention of any hunting or fishing rights.[24] The absence of specific compensation for the rights at issue is entirely consistent with our interpretation of the 1901 Agreement.

## VII

Thus, even though "legal ambiguities are resolved to the benefit of the Indians," *DeCoteau* v. *District County Court*, 420 U. S. 425, 447 (1975), courts cannot ignore plain language that, viewed in historical context and given a "fair appraisal," *Washington* v. *Washington Commercial Passenger Fishing Vessel Assn.*, 443 U. S., at 675, clearly runs counter to a tribe's later claims. Careful examination of the entire record in this case leaves us with the firm conviction that the exclusive right to hunt, fish, and gather roots, berries, and seeds on the lands reserved to the Klamath Tribe by the 1864 Treaty was not intended to survive as a special right to be free of state regulation in the ceded lands that were outside the reservation after the 1901 Agreement. The judgment of the Court of Appeals is therefore reversed.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of this case.

---

[24] The Indian Claims Commission's findings of fact include a reference to the "subsistence" value of nonlumbering and nongrazing areas within the ceded lands, without further definition of the term. 20 Ind. Cl. Comm'n, at 536. To the extent that this indicates that the Commission considered hunting, fishing, and gathering of food in determining the value of the land, however, it further undercuts the Tribe's reliance on an alleged failure of compensation for hunting and fishing rights.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

The Court today holds that the Klamath Tribe has no special right to hunt and fish on certain lands although it has done so undisturbed from time immemorial. Instead, the Tribe is determined to be subject to state regulation to the same extent as any other person in the State of Oregon. This Court has in the past recognized that Indian hunting and fishing rights—even if nonexclusive, and even if existing apart from reservation lands—are valuable property rights, not fully subject to state regulation and not to be deemed abrogated without explicit indication.[1] Although all agree that hunting and fishing have historically been vital to the continued prosperity of the Klamath, the Court today assumes that the Klamath Tribe silently gave up its rights to hunt and fish on these lands in a 1901 Agreement, approved by Congress in 1906, that had no purpose other than to benefit the Tribe for a previous injustice. It reaches this conclusion even though there is no historical evidence that any party to the Agreement envisioned it as having the effect of altering tribal hunting and fishing practices, and even though hunting and fishing practices did not in fact change as a result of the Agreement. Although I agree that the boilerplate language of the Agreement can be read as the Court does, I also believe that such a reading is not necessary, ignores the Agreement's historical context, and is not faithful to the well-established principles that Indian treaties are to be interpreted as they were likely understood by the tribe and that doubts concerning the meaning of a treaty should be resolved in favor of the tribe.[2] Accordingly, I dissent.

---

[1] See, e. g., United States v. Sioux Nation of Indians, 448 U. S. 371, 422–423 (1980); Menominee Tribe of Indians v. United States, 391 U. S. 404 (1968); Tulee v. Washington, 315 U. S. 681 (1942).

[2] See Washington v. Washington Commercial Passenger Fishing Vessel Assn., 443 U. S. 658, 675–676 (1979); Choctaw Nation v. Oklahoma, 397 U. S. 620, 631 (1970); see also Menominee Tribe of Indians v. United

## I

I will only briefly summarize the relevant history of the Klamath Reservation. As the Court explains, in 1864 the Klamath Tribe entered into a treaty with the United States whereby it agreed to settle on a reservation of 1.9 million acres in south central Oregon. Treaty of Oct. 14, 1864, 16 Stat. 707. This land was a small part of the 22 million acres of land to which the Klamath had held aboriginal title. As the Court points out: "The 1864 Treaty also provided that the [Klamath Tribe] would have . . . 'the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits.'" *Ante*, at 755. Although the borders of the reservation soon became the subject of some dispute, the purposes of the Treaty have always been clear. These purposes, and the importance of Indian hunting and fishing rights to their accomplishment, were well stated in a report to Congress by a Commission appointed to study the later boundary dispute:

> "It was evidently a principal object of the treaty to draw the Indians in from the large extent of territory over which they were roaming, subject to constant collisions with the steadily encroaching whites, and to concentrate them on an area much more limited, but which would still be ample to provide them with the means of subsistence.
>
> "To attain this, the marked tendency of the treaty and the emphatic testimony of the Indians seek to make all the boundaries mountain ridges, a purpose of which the nature of the country renders easy of accomplishment on all sides except the north.
>
> "There is no provision in the treaty, however, for the support of the Indians by the Government, and as the

---

*States, supra,* at 413 (the intention to abrogate treaty rights is not to be lightly imputed to Congress).

high altitude and the severity of the climate are unfavorable to the cultivation of cereals, their subsistence depended upon natural products, consisting principally of game, fish, wild roots, and seeds. These mountain barriers, therefore, must include a territory frequented by game, streams stocked with fish, and ground producing the roots and seeds which formed so large a portion of the subsistence of the Indians." S. Doc. No. 93, 54th Cong., 2d Sess., 6–7 (1897) (Klamath Boundary Commission Report).

The boundaries of the reservation that was eventually established pursuant to the Treaty, however, contained only about two-thirds of the land promised the Klamath Tribe, and among the areas left outside the reservation were tribal hunting, fishing, and gathering grounds of substantial importance. These areas had been specifically included in the Treaty's definition of the planned reservation at the Tribe's insistence; but, as the result of an erroneous 1871 survey, over 617,000 acres of land promised to the Tribe were excluded from the newly established reservation. As a result of the erroneous survey and in violation of the Treaty, non-Indians began to enter on the land for stock grazing and, to a lesser extent, for settlement. See, e. g., S. Exec. Doc. No. 129, 53d Cong., 2d Sess., 4–6, 8–9, 11, 17 (1894) (various documents noting grazing uses and relatively light settlement); see also n. 5, infra. The Klamath vehemently and repeatedly protested these entrances, but nevertheless continued to hunt and fish on the excluded land. See S. Doc. No. 93, supra, at 11, 15–16, 18. The protests continued for decades, and eventually led to Congress' establishment of a Boundary Commission to determine the proper boundaries of the reservation and to determine the value of the erroneously excluded land. Act of June 10, 1896, ch. 398, 29 Stat. 321, 342.

The Boundary Commission went to the reservation and interviewed large numbers of Klamath. Tribal elders all

insisted that they were sure that the disputed land was supposed to be in the reservation. They had explicitly demanded the land's inclusion in the 1864 Treaty, they explained, because of the land's traditional importance in the Tribe's essential hunting, fishing, and gathering activities. The Commissioners inspected the land and found a tribal fishing site upon which a stone dam had been constructed and maintained by the Tribe to aid in gathering large numbers of fish. The Commission concluded that the Klamath's complaints were largely justified and deserving of redress.[3]

The Commission determined, pursuant to the Tribe's desires, that redress would take the form of officially ceding the excluded land back to the United States for compensation, leaving the border of the reservation where it had been erroneously set. As the Court notes, however, the Commission determined the value of the excluded land with no reference to its use for hunting, fishing, or gathering—basing valuation on its use for timber and stock grazing. Yet the Commission knew the land's importance to the Tribe for hunting and fishing, since this was the basis of the Commission's finding that it had been erroneously excluded from the reservation. Similarly, during the course of the two years of negotiations toward an agreement, there was no reference to any cessation of hunting, fishing, or gathering activity on the land in question, nor, it is true, to the continuing of such activity. The

---

[3] The Boundary Commission concluded its report as follows:

"In conclusion, we respectfully submit that during all this long period of thirty-two years these Indians have exhibited a patient and unwavering confidence in the justice of the Government demanding the highest commendation.

"Believing themselves to be grievously wronged by the white settlements on land they considered secured to them by solemn pledge of the Government and from which their subsistence was largely drawn, they yet endured all the aggravating conditions of these years, resisting all the allurements of the adjacent and kindred tribes during the [recent war] and remained loyal and true." S. Doc. No. 93, 54th Cong., 2d Sess., 11 (1897).

issue was simply never mentioned, and there is certainly no specific evidence that anyone, whether Klamath or Government official, envisioned that the Agreement would compel the Tribe to in any way alter the important hunting and fishing activities that it had been engaged in since the initial establishment of the reservation. During that time the Tribe had been forced to accept that others were entering and using the land, but the Tribe also had continued to fish and hunt as it always had done.

The Court is correct that the Tribe seemed fully satisfied with the possibility that the excluded land would be ceded to the United States for compensation, and there were no protests raised concerning loss of fishing, hunting, and gathering rights. *Ante*, at 759. But I cannot conclude from this silence that the Tribe understood and agreed to the extinguishing of hunting and fishing rights on the ceded land. *Ante*, at 770. Given the historical context of the 1901 Agreement, its proper interpretation is that, first, it compensated the Tribe for the fact that its position since the reservation's establishment had been less than the Tribe had been promised, and, second, it preserved the Tribe's position as it had actually existed since the erroneous survey. The Tribe's actual position between the erroneous survey and the 1901 Agreement included no ability to exercise exclusive possession of the erroneously excluded lands, although they had been promised that right in the 1864 Treaty; but the Tribe's position did include the ability to hunt and fish on those lands, and there is no reason to believe that a goal of the 1901 Agreement was to terminate such activities.

## II

### A

As the Court notes, the case focuses on two provisions of the 1901 Agreement. Article I of the Agreement contained a broad cession by the Tribe of "all their claim, right, title,

and interest in and to" the excluded land. 34 Stat. 367. In
contrast, Article IV of the Agreement broadly declared that
"nothing in [the] agreement shall be construed to deprive the
said Klamath . . . of any benefits to which they are entitled
under existing treaties, not inconsistent with the provisions
of this agreement." Respondent and the courts below ar-
gued that the language of Article IV can reasonably be in-
terpreted as a reservation by the Indians of a nonexclusive
right to hunt and fish on those parts of the ceded land not in
private hands.[4]

The Court rejects this construction of Article IV because
of its unexplained insistence that the 1901 Agreement must
be understood in terms of the structure of the 1864 Treaty,
which envisioned no nonexclusive or off-reservation hunting
rights. Indeed, as the Court emphasizes, a provision of the
1864 Treaty obligated the Tribe's members to remain on the
reservation established by its terms. 16 Stat. 708. Thus, in
the Court's view, because the reservation was diminished by
the 1901 Agreement, and because the 1864 Treaty envisioned
that the Tribe would hunt and fish only on its reservation, the
1901 Agreement must also have diminished the area where
hunting and fishing rights existed. To allow nonexclusive

---

[4] As the Court notes, *ante*, at 764–765, n. 15, the Klamath claim a hunt-
ing and fishing right quite similar to the right of nonexclusive, off-
reservation hunting and fishing expressly reserved by many of the Indians
of the Pacific Northwest when they entered cession agreements. See
*Puyallup Tribe* v. *Department of Game of Washington*, 391 U. S. 392
(1968); *United States* v. *Winans*, 198 U. S. 371 (1905). I would also agree
with the Court that such a right is not an "absolute freedom from state
regulation." See *ante*, at 765, n. 16. It should also be emphasized, how-
ever, that the right is nonetheless a valuable one, placing significant limits
on permissible state regulation. See *Antoine* v. *Washington*, 420 U. S.
194, 207 (1975) (State must demonstrate that its regulation is a reasonable
and necessary conservation measure and that its application to the Indians
is necessary in the interest of conservation); see also *Department of Game
of Washington* v. *Puyallup Tribe*, 414 U. S. 44 (1973); *Tulee* v. *Washing-
ton*, 315 U. S., at 684.

hunting and fishing rights on the ceded lands would, in the Court's view, create a "glaring inconsistency" with the 1864 Treaty, because to exercise such a right would have required the Tribe to leave the borders of its now-diminished reservation, in violation of the 1864 Treaty obligation to remain on reservation land. *Ante*, at 770.

## B

This overly formal approach to treaty interpretation ignores the fundamental presumptions that Indian treaties are to be construed as the tribes would have understood them, *Choctaw Nation* v. *Oklahoma*, 397 U. S. 620, 631 (1970), and that ambiguities should be resolved in favor of the tribe. *Washington* v. *Washington Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 675–676 (1979). I would have thought that an inquiry into the 1901 Agreement's meaning would focus, not primarily on the formal structure of the 1864 Treaty—leaving both documents abstracted from their actual purposes and historical contexts—but instead on the problems that arose since 1864 that gave rise to the need for the 1901 Agreement. Certainly, the latter approach is better suited to the goal of determining the purposes of the parties, and especially, to the goal of determining the understandings of the Tribe.

When looking at the 1901 Agreement in terms of its own historical setting, the evidence clearly supports two conclusions—first, that the Tribe had no expectation that it was losing its ability to continue those fishing and hunting practices that it had been pursuing from time immemorial on the ceded lands, and second, that the United States had no particular interest in terminating such fishing and hunting activities.

## (1)

The Tribe's perspective is not difficult to divine. At the time of the 1901 Agreement, as well as at the time of the 1906

Act of Congress which ratified this Agreement, "[h]unting, fishing, gathering and trapping [were] crucial to the survival of the Klamath Indians." App. 19 (stipulated facts). The Tribe had received, under the 1864 Treaty, the right to hunt and fish on the specific lands that were ceded in the 1901 Agreement, and had received that right because it had insisted on the particular importance to the Tribe of its ability to hunt and fish on those specific lands. Although these lands had not been included within the erroneous borders of the original reservation, the Tribe nevertheless entered them to hunt and fish.

The 1864 Treaty had also granted the Tribe the exclusive right to possess the lands in question, and particularly prohibited the use of these lands by non-Indians. 16 Stat. 708. But the Tribe had never been able to exercise this right to exclude others. The erroneous boundaries had opened the lands to others; thus, the Tribe's ability to hunt and fish had become nonexclusive and its ability to exercise exclusive possession had disappeared. This was what it had lost, and accordingly, tribal members' complaints had focused only on the presence of non-Indians on their lands. They never asserted an interference with their ability to hunt and fish. It is clear that the Tribe envisioned the 1901 Agreement only as providing compensation for the loss that the Tribe had suffered. And there is certainly nothing in the record to indicate that the Agreement in any way was working a further loss on the Tribe. In this context, Article IV makes clear that the Tribe was not to lose any benefits that it had actually possessed as it entered the 1901 Agreement.

### (2)

The United States' purposes were similarly clear, as the 1901 Agreement was entirely a result of Indian demands for the redress of an unfortunate mistake. The United States fully understood that the land in question was ill-suited for agriculture and settlement, and the record reflects no other

collateral purposes of Congress. Indeed, there is no evidence of any pressures on Congress from non-Indians urging the cession at issue.[5] There is simply no reason to believe that the United States—acting as trustee and seeking to compensate the Tribe for an unjust and accidental diminishment of their reservation—intended silently to effectuate a further diminution of tribal rights. We should not lightly assume that Congress, acting as a trustee of the Tribe's interests, wished to deprive the Tribe of access to food supplies that it might need and had always utilized.

It is likely that the United States' interests in 1901 had little to do with preserving the formal structure of the 1864 Treaty, an interest that the Court today assumes. Although the 1864 Treaty required the Tribe to stay on the land reserved to it by the Treaty, the alternative in 1864 was the Tribe's continued presence on over 22 million acres of land to which it held aboriginal title. The land on which the Tribe was to stay, although poor land for settlement, was known to contain game, fish, and vegetation in such quantities as to allow the Tribe to be self-sufficient with no reason to wander. By 1901, there was no longer an issue as to whether the Tribe would ever again wander over the 22 million acres they had once held under aboriginal title—the Klamath had fully accepted that they would remain on a much smaller area. But the issue of retaining the Tribe's self-sufficiency was still a concern.

In 1901, the Klamath were not viewed as hostile Indians, see n. 5, *infra*, and the surrounding land was minimally settled at best. For the United States to prohibit all tribal

---

[5] As the Court points out, see *ante*, at 759–760, n. 8, the United States' first negotiator considered the excluded land "practically worthless" and believed that Congress should restore to the reservation the unentered excluded acreage rather than purchase it. The Tribe resisted this recommendation, preferring the compensated cession that was eventually accepted by Congress.

access to the ceded areas would have served no interest that the United States ever publicly declared, and it would have compromised the Klamath's ability to remain self-sufficient. It is thus unreasonable to believe that the United States, while purporting to act for the benefit of the Indians, placed a high priority on assuring that the Klamath be strictly confined to the now-diminished area of their reservation, even if that would mean less access to food. The United States' interests would have been fully served by reading the 1864 Treaty to require only that the Tribe not leave the area that was initially specified as the reservation. Article IV of the 1901 Agreement can thus easily be seen as an effort to preserve the Tribe's right to travel, hunt, and fish on the full area of *the original* reservation, so long as those activities are consistent with the Tribe's loss of exclusive possessory rights in the ceded lands. So long as the ceded lands were not opened to significant settlement, this resolution would fully serve what interest there still was in containing the Klamath and would not compromise the shared interest in continuing the Klamath's self-sufficiency.

### (3)

This interpretation of the parties' perspectives fully conforms to what we know of the parties' subsequent behavior.[6] Congress never opened the ceded lands to settlement, and in fact, by the time it had ratified the 1901 Agreement, "[v]irtually all the land ceded by the Tribe was . . . closed to entry and placed in either national forests or parks." App. 13–14 (stipulated facts). No argument has been made that continued hunting and fishing by the Indians is incompatible with the land's uses. The Tribe's behavior is also fully consistent

---

[6] This Court has accepted that subsequent history of Indian lands can give "additional clue[s] as to what Congress expected would happen [with respect to] land on a particular reservation." *Solem* v. *Bartlett*, 465 U. S. 463, 472 (1984).

with its current interpretation of the Agreement. The parties have stipulated that the Tribe has in fact "continued to hunt, fish and trap on the excluded lands from the time of their cession to the present," *id.*, at 14 (stipulated facts). Thus, no subsequent behavior of the United States or of the Tribe reflects an expectation that the Tribe would alter its hunting and fishing patterns as a result of the cession.

### (4)

Last, the 1901 Agreement's treatment of the issue of compensation also provides evidence that the parties did not envision that the Agreement denied the Klamath continued access to these traditional hunting and fishing grounds. The parties have stipulated that the Commission in no way considered the land's value for hunting or fishing when it calculated the proper compensation to the Tribe. *Id.*, at 12. Yet, the Commission was well aware that the land was a hunting and fishing ground of some importance to the Tribe. Similarly, when the Indian Claims Commission reviewed and supplemented the compensation awarded the Klamath — more than six decades after the ratification of the Agreement — it never assigned any value to hunting or fishing rights. *Id.*, at 14; see also *Klamath and Modoc Tribes* v. *United States*, 20 Ind. Cl. Comm'n 522 (1969). The silence of both these bodies is not surprising, if one accepts that the cession did not envision that Indian hunting and fishing would cease. We do not normally assume that the United States, without providing compensation, intended to deprive a tribe of valued hunting and fishing rights. *Menominee Tribe of Indians* v. *United States*, 391 U. S. 404, 413 (1968) (will not lightly assume that Congress meant to abrogate hunting and fishing rights without provision of compensation); cf. *United States* v. *Sioux Nation of Indians*, 448 U. S. 371, 422–424 (1980) (will not assume that compensation designed to ensure Tribe's survival after it gave up traditional

hunting activities was intended to cover both the taking of hunting rights and the taking of land). Nor should we lightly assume that the Tribe silently accepted the lack of specific compensation because its members understood that their valued hunting and fishing rights were merely incidental to land ownership.[7]

C

The analysis of the Agreement offered here is fully consistent with this Court's prior cases regarding Indian hunting and fishing rights. We have accepted that nonexclusive hunting and fishing rights have often existed independently from rights of exclusive possession of land. Thus, there have been many treaties in which Indians have explicitly reserved nonexclusive hunting and fishing rights while ceding the corresponding lands. See nn. 1 and 4, *supra*. Similarly, Congress has explicitly reserved to a Tribe continued hunting and fishing rights even after a reservation has been fully terminated. See, *e. g.*, 25 U. S. C. §564m(b) (fishing rights explicitly reserved upon termination of Klamath Reservation in 1954); see also *Kimball* v. *Callahan*, 590 F. 2d 768, 772 (CA9), cert. denied, 444 U. S. 826 (1979). But most importantly, this Court has held that hunting and fishing rights can by implication survive the full termination of a reservation, even where the enactment terminating the reservation is written in broad language and makes no reference to those rights' survival. *Menominee Tribe of Indians* v. *United States, supra.*

In this case, as a result of the erroneous survey there was a *de facto* separation of the Klamath's hunting and fishing

---

[7] The Court speculates that the right to hunt and fish was simply not viewed by the Indians as a right separate from the right to possess the land. But the Indians clearly did value the hunting and fishing, and both before and after the 1901 Agreement, the Indians continued to hunt and fish without interference even though, during both periods, they knew that they did not exercise exclusive possession of the land. I decline to assume that the Indians were simply consciously violating the law.

rights from their rights of exclusive possession of the land. The former rights existed to the extent they could, consistent with the loss of the latter rights. In essence, the Tribe was left with off-reservation rights to hunt and fish on land from which it could not exclude others. The 1901 Agreement, which preserved to the Klamath all "benefits to which they are entitled under existing treaties, not inconsistent with the provisions of the [cession]," was not meant to take from them what was left of their right of access to their traditional hunting and fishing grounds.

### III

In light of this Court's repeated statements that the abrogation of Indian rights should not be lightly inferred, and that treaties be interpreted as they would have been understood by the Indians, I find the Court's opinion today disturbing. Rather than follow the sort of historical inquiry that these canons should call for, the Court analyzes the case as one involving little more than the plain meaning of boilerplate language. It turns to history only to determine if its perceived "plain meaning" would be an impossible one. Ultimately, this produces a largely insensitive and conclusory historical inquiry that ignores how events almost certainly appeared to the Tribe.

The decision today represents another erroneous deprivation of the Klamath's tribal rights. The Court has offered no reason to believe the 1901 Agreement was designed to accomplish anything other than the redress of the wrong that had already been done to the Tribe. The Court has certainly offered no reason to believe that it was designed to effectuate a further diminution of the Klamath's rights.

I respectfully dissent.